STATE EX REL. JAMES F. MARTIN v. J. A. A. BURNQUIST.[1]

December 27, 1918.

No. 21,175.

**Officer — removal for misconduct.**

1. In order to warrant the removal of an elective public officer under section 5724, G. S. 1913, the misconduct complained of must have some connection with or relation to the performance of the officer's official duties.

**Removal of probate judge for disaffection toward the government.**

2. Acts and conduct in opposition to the policy of the Federal government in entering into the war with Germany, having no relation to the

[1] Reported in 170 N. W. 201, 170 N. W. 609.

official duties of a judge of probate. furnish no sufficient legal basis for an order by the Governor of the state removing an incumbent of that office.

### Removal of officer — taxation of costs.

3. In proceedings under G. S. 1913, § 5724, for the removal of a public officer for misconduct in office, where the order of removal is set aside by the supreme court on certiorari, the officer proceeded against is not entitled to costs and disbursements either against the Governor or against the persons who petitioned the Governor for his removal. Such proceedings are solely in the public interest and those who join do not become parties to the record or liable for costs. [Reporter.]

Upon the relation of James F. Martin the supreme court granted its writ of certiorari directed to the Honorable J. A. A. Burnquist, Governor of the state of Minnesota, and the district court of Dodge county, to review proceedings had in that court for the removal of relator from the office of judge of probate for that county. Reversed.

*Fred W. Senn* and *Edgerton & Dohs,* for relator.

The Governor of Minnesota has no jurisdiction to remove a judge of probate from office, because a judge of probate is not an "inferior officer." Minn. Const. art. 13, §§ 1, 2. If a judge of probate is an "inferior officer," within section 2, he can only be removed for malfeasance or nonfeasance in the performance of his official duties. G. S. 1913, § 5724. The office of a judge of probate may become vacant on his conviction of any infamous crime, or of any offense involving a violation of his official oath. G. S. 1913, § 5723. The probate court is a court of superior jurisdiction and enjoys the same presumptions of jurisdiction as superior courts of common-law jurisdiction. Its presiding officer therefore cannot be held to be an "inferior officer" within Const. art. 13, § 2. See 2 Dunnell, Minn. Dig. § 7770, and cases cited. The word "inferior" as applied to courts and found in constitutional and statutory provisions is used in a technical sense, and applies to courts which are created on such principles that their judgments taken alone do not import jurisdiction. 7 R. C. L. 974, 975.

Malfeasance is the doing of an act by an officer, either through ignorance, inattention or malice, which act must be done by virtue of his office, and which act he as an officer has no right to do at all, as where

he acts without any authority at all, or exceeds, ignores or abuses his power to act as an officer. State v. McClellan, 113 Tenn. 616, 85 S. W. 267, 3 Ann. Cas. 992; Bell v. Josselyn, 3 Gray (69 Mass.) 309, 63 Am. Dec. 741; Coite v. Lynes, 33 Conn. 109. Not only must the misconduct be official, but it is essential that an evil intent or motive must accompany the act. There must be corruption which must be both averred and proved. There must be a corrupt motive or knowledge on the part of the officer that his official act is a violation of law. Com. v. Wood, 25 Ky. L. R. 1019, 76 S. W. 842; Stokes v. Stokes, 23 App. Div. 552, 48 N. Y. Supp. 722. Malfeasance that justifies removal must be such as affects the officer's performance of duties of his office. The officer must be separated from the man. Mechem, Public Officers, § 457; State v. Coon, 14 Minn. 340, 342 (456, 459); State v. Wedge, 24 Minn. 150; State v. Peterson, 50 Minn. 239, 52 N. W. 655; State v. Ward, 70 Minn. 58, 72 N. W. 825; Sykes v. City of Minneapolis, 124 Minn. 73, 76, 144 N. W. 453; People v. Cocks, 149 App. Div. 883, 134 N. Y. Supp. 808; State v. Common Council of Duluth, 53 Minn. 238, 55 N. W. 118, 39 Am. St. 595.

General Statutes 1913, § 5724, is strictly limited to a removal for malfeasance or nonfeasance in the performance of the officer's official duties. The legislature in adopting this section according to authority conferred by Const. art. 13, limited the grounds for removal specified by the Constitution, which (art. 13, § 2) authorizes removal for malfeasance or nonfeasance in the performance of the officer's duties, while section 5724 provides that they must be official duties.

Where a wilful intent to accomplish an evil purpose, denounced by law, is an essential element of the offense, the burden is upon the state to prove wilfulness. State v. Cowdery, 79 Minn. 94, 81 N. W. 750, 48 L.R.A. 92; Barber v. State, 78 Ala. 19; Chrisman v. State, 54 Ark. 283, 15 S. W. 889, 26 Am. St. 44; People v. Mooney, 127 Cal. 339, 59 Pac. 761; Roberts v. People, 19 Mich. 401; McCourt v. People, 64 N. Y. 583; Felton v. U. S. 96 U. S. 699, 702, 24 L. ed. 875; Com. v. Kneeland 20 Pick. (Mass.) 206, 220; Potter v. U. S. 155 U. S. 438, 446, 15 Sup. Ct. 144, 39 L. ed. 214.

None of the acts specified in the charges and specifications, evidence or findings, constitutes a violation of defendant's oath of office as probate judge, which is and was only that he would support the Constitution

of the United States, the Constitution of the state of Minnesota, and faithfully and impartially discharge the duties devolving upon him as probate judge. Minn. Const. art. 4, § 29; G. S. 1913, § 5733.

On the facts, this case is within the ruling of this court in Lydiard v. Wingate, 131 Minn. 355, 155 N. W. 212, where the court uses the following language: "The interest which every citizen has in good government requires that the right be not unduly curtailed to express his opinion upon public officials and political leaders, to seek and convey information concerning their plans and purposes, and to freely criticize proposed methods and measures."

If the construction of the Espionage Act in U. S. v. Hall, 248 Fed. 150, is correct, then these proceedings must at once fail, because none of the statements made by relator was made to any person either within the military or naval forces of the United States, or about to be inducted into the army or navy, and there is no allegation nor proof that any of the statements alleged to have been made by relator either did or could have in any way affected or interfered with the operation or success of the military or naval forces of the United States, or either did or could have promoted the success of its enemies, or created any insubordination, disloyalty, mutiny or refusal of duty on the part of such military or naval forces. Nor is there allegation or proof that said statements, or any of them, were made with the intent to wilfully obstruct the recruiting or enlistment service of the United States, or that any of such statements either did or could have had any such effect. There is neither allegation nor proof that any of these alleged statements were ever made in the presence or hearing of any person in the military or naval forces of the United States, nor that said statements, if made, either did or could have in any way interfered with the operation and success of the military or naval forces of the United States, or created any insubordination, disloyalty, mutiny or refusal of duty on the part of such forces, or that they obstructed in any way the recruiting and enlistment service.

It will probably be claimed that the alleged statements of the relator constitute a violation of his official oath. This we emphatically deny. His oath of office was simply that he would support the Constitution of the United States, the Constitution of the state of Minnesota, and faith-

fully and impartially discharge the duties devolving upon him as probate judge.

There is neither allegation, nor proof that the defendant has not in all things and at all times supported the Constitution of the United States and also the Constitution of the State of Minnesota; nor is there any claim that he has not faithfully and impartially discharged the duties devolving upon him as probate judge.

*Ambrose Tighe* and *H. J. Edison,* County Attorney, for respondent.

The Minnesota Constitution (art. 13, §§ 1, 2) provides two methods of removal of public officers, and two only—one by impeachment and the other by procedure under appropriate legislative enactment. Impeachment is the constitutional procedure for the removal of a Governor, secretary of state, treasurer, auditor, attorney general, and the judges of the supreme and district courts. They can be removed by impeachment only, and no other officers may be impeached. Section 2 of article 13 says that the legislature may provide for the removal of inferior officers from office, and in pursuance of this section, the legislature has enacted chapter 47, G. S. 1913, under which this proceeding is brought. A judge of probate is included in the statute as one of the officers to whom chapter 47 is applicable, but the relator says the legislature had no right to so include him because he is not an inferior officer. The argument amounts, therefore, to saying that a probate judge cannot be removed at all. He cannot be removed under section 1 because he is not there mentioned, and he cannot be removed under section 2 because he does not come within the category which it covers.

The relator seeks to avoid this dilemma of his own creation by citing G. S. 1913, § 5723. This provides (subdivision 5) that every office shall become vacant on the officer's conviction of any infamous crime or any offense involving a violation of his official oath. The relator says that while a probate judge cannot be impeached and the legislature cannot authorize the Governor to remove him on charges after a hearing, still it does lie in the legislature's power to provide for the summary vacation of his office, on the happening of either of the contingencies specified in section 5723, subd. 5, supra. But this argument is self-destructive. If an office becomes vacant before the expiration of an incumbent's term,

otherwise than by death or resignation, the incumbent must have been removed, and if a judge of probate is not included among inferior officers, he would be as immune from the provisions of section 5723, subd. 5, as he would be from section 5724, and from the rest of chapter 47.

Until within the last 10 or 15 years in most of the states there were only two kinds of removal proceedings for state officers: Impeachment and proceedings under chapter 47. Of late another system, that of popular recall, has been added to these in some jurisdictions and in some even made the sole removal system, to the exclusion of both of the earlier methods. Impeachment and statutory removal, in general, proceed on the same theory, the difference being in the adjudicating tribunals and the grade of the amenable officials. Impeachment is a rare remedy in American history. It is very cumbersome and expensive. There have been less than a dozen impeachment trials before the United States Senate, and of late impeachment has been resorted to by states, as far as appears, in two or three instances only. The authorities are not in harmony as to whether a senate, during an impeachment, sits as a court, or as a sui generis body, neither judicial nor legislative, but the weight of authority is in favor of the second proposition. No court has ever claimed the right to review a judgment of impeachment by certiorari or otherwise, and therefore the rulings of the various senates have not been made a subject of judicial comment. In some states, the Governor's decision in a statutory removal proceeding is not subject to any sort of appeal, the proceeding being recognized as analogous to impeachment and subject to the same rules. There is, therefore, an absence of decisions, throwing any light on the question, from the reports of such states. In other states, the courts assert a qualified right of review. They go as far as to inquire whether the accused had proper notice and a reasonable opportunity to make his defense. But they do not undertake to consider the evidence or to pass judgment on the propriety of the Governor's conclusions. The cases are compiled in 39 L.R.A. (N.S.) 788. Minnesota has construed the Governor's functions under chapter 47 as quasi-judicial in character and, therefore, reviewable by certiorari, inasmuch as no appeal is provided for. In the Kinsella case,[1] where this ruling was made, the court proceeded to pass on questions of

[1] [State ex rel. Kinsella v. Eberhart, 116 Minn. 313, 133 N. W. 857].

the admissibility of evidence and the general merits. We are not advised whether it will pursue this course in general. If an appellate court undertakes a general review in such matters at the instance of a removed official, it would perhaps be bound also to do this at the instance of the petitioners, when the Governor had refused to remove an accused official. This would lead to some embarrassments and eventuate, if it eventuated in anything practical, in the substitution of the courts for the Governor as the adjudicating tribunal.

There is from all courts almost a complete absence of reports about judicial reviews of a Governor's action in statutory removal proceedings, unless the Kinsella case is an exception. And the significance of this is here: The courts thus recognize the analogy between such proceedings and impeachment and that the principles applied in impeachment cases are also applicable in statutory removal proceedings where the Governor is the tribunal provided for by the statutes.

But those decisions in Minnesota and many of those cited from other states have to do with the action of subordinate authorities like city councils or county boards, acting under special statutes which define their removal functions with great exactness and the issue in most of them has involved features of partisanship or a thirst for spoils, which have made the courts scrutinize what has been done with peculiar care.

It is suggested in passing that the review by this court of a proceeding under chapter 47 is not like the review of a subordinate body's action or even like the review of a trial in the lower court. It is rather in the nature of a re-examination by a co-ordinate branch of the state government of the Governor's doings and its purpose is not to examine the minutiae of the proceeding, but at the most to determine whether substantial justice under the Constitution and the laws has been done.

Some decisions have advanced the principle, that the malfeasance complained of must relate to the administration of the office. This is quite an easy thing to say, but to determine what this means is more difficult, and the application of it in any particular instance is still more difficult. Clearly any officer who does wrong in his immediate official duties is guilty of malfeasance in office, if, for example, being register of deeds, he forges his records; if, being treasurer, he falsifies his accounts; or if, being a judge, he sells justice for a price. There is no trouble about

this. But suppose an officer does his official duties, strictly so-called, with intelligence and fidelity, but in his private life is bad or is guilty of offenses against the criminal law which have nothing to do with the proper performance of his official duties. Some of the southern cases cited by the relator hold that a county officer, who is an habitual drunkard, is not guilty of malfeasance in office, unless it is also proved that his habits interfered with proper attention to his job. A register of deeds can get drunk as often and as much as he pleases and no one has the right to complain, provided his habits do not interfere with his copying his papers correctly. A sheriff can do the same thing with impunity, if he has the sense to employ a competent deputy who will serve promptly process and the writs which come to his office.

Suppose a judge of probate is an inferior officer and is diligent and able in the performance of his direct judicial duties, but has a persistent habit in and out of court of ribald speech which offends and outrages decent people. Is he none the less immune from removal? Suppose a public official holding an inferior office is guilty of murder. Is this malfeasance in office for which he can be removed under chapter 47? The relator says no, but meets the trouble by this suggestion: If he commits murder, he will go to jail, and will, therefore, be unable to do his work and be removed for nonfeasance. But suppose he is guilty of some offense disgraceful and shameful in character, but which is punishable by fine only, and on his conviction he is not incarcerated at all but simply mulcted in money. The answer to this is perhaps to refer to section 5723, subd. 5. But that subdivision is unconstitutional, unless conviction of an infamous crime is malfeasance in office, because malfeasance and nonfeasance in office are the only grounds for the removal of inferior officers under article 13, § 2. What then is the situation? It is this: It is not necessary to lay down any general rules. Doings not directly affecting the performance of official duties may be malfeasance in office in the case of officials of one sort and the same doings may not be malfeasance in office in the case of officials of another sort. Under all circumstances, except where the statute specifically provides to the contrary, malfeasance which simply means wrongdoing, is any course of conduct by an official which is inconsistent with the proper performance of his official duties, ranging perhaps from physical infirmities in the

case of a constable, who should have good legs to get around on, up to habits of mind and conduct and general good repute in the case of a judge. This court has recognized the idea in the Kinsella case, when it said that a county was entitled to have a man of fair repute as its chief law officer and that the Governor was entitled to take into consideration conduct of the accused, inconsistent with this standard, in determining whether a county attorney should be removed from office.

The very issue here raised was the fundamental issue in the impeachment of E. St. Julien Cox before the Minnesota Senate in 1882. Judge Cox was not charged with corrupt conduct in office. The only offenses specified were repeated acts of intoxication. His attorneys argued that intoxication was not a crime or misdemeanor by statute in Minnesota or at common law, and that impeachment could not be predicated on any offense except an indictable one, and no indictable offense is impeachable unless it is committed in the administration of office—"under color of office," as they phrased it. Many reputable authorities were presented which supported this contention. If sustained they would have led to the inevitable conclusion that a judge of the district court could time and time again sit on the bench in a state of drunkenness, could publicly consort with harlots and could sway in fuddled condition along the public streets, an object of ridicule and shame, and yet that the state had no power to oust him from office, unless it was also in position to prove a connection between these performances and specified acts of judicial maladministration on his part.

Fortunately there were precedents and authorities to the contrary. These had been compiled in an article in 6 American Law Register, 644, and were presented by the board of managers conducting the impeachment for the House of Representatives. The first case of impeachment before the United States Senate (that of Timothy Pickering) included as one of its four charges that on November 11 and 12, 1802, Judge Pickering appeared on the bench in a state of total intoxication and did then and there in a most profane and indecent manner invoke the name of the Supreme Being. In 1862 West W. Humphreys, Judge of the United States District Court for the district of Tennessee, was successfully impeached on the charge of advocating secession, which was neither a common law nor a statutory offense. The articles of im-

peachment against Andrew Johnson included accusation of public intoxication while swinging "around the circle."

In the Cox case the senate adopted this view, to-wit: That personal conduct inconsistent with the dignity of the office filled, makes an incumbent unfit and he may be impeached for crimes and misdemeanors, even if the conduct does not constitute an indictable offense and even though it has no immediate relation to his official duties. And this court, by implication at least, advanced the same view as to statutory removal proceedings, when it expressed in the Kinsella case the opinion already referred to and the exact language in reference to which was as follows: "The county attorney should be a man of fair standing as a citizen and fully in sympathy with the proper administration of his office and the enforcement of the laws."

The offenses proved in the instant case are malfeasance in office, under the strictest construction of the term, for the following, among other reasons: (1) Under G. S. 1913, § 7200, "the [probate] court shall always be open for the transaction of business." Anything which a probate judge does or says either in the court room or out of it, is done or said in office, because it is impossible for him at any hour or in any environment to dissociate himself from his official duties. Once a judge, a judge at all times. (2) When a probate judge assumes office, he takes an oath to support the Constitution of the United States and the Constitution of the state of Minnesota, and to faithfully discharge the duties devolving on him as judge.

The relator appears to claim that this does not include an obligation to also support the laws of the two sovereignties. Speaking generally, this would seem an impossible position. As a judge, he becomes a governmental instrument of law enforcement and it would be a contradiction in thought if an agent of law enforcement could himself violate law and still prove true to his oath to faithfully discharge his judicial duties. But let us limit his obligation to the support of the two Constitutions. On April 6, 1917, under the constitutional powers conferred on it, Congress *passed a law* declaring war. That this country might win the war, Congress passed the Selective Service Act and the Espionage Act. That this country might win the war, the legislature of Minnesota enacted chapter 463, Laws 1917, making seditious talk a misde-

meanor.   The existence of the Constitution of both state and nation depended on the successful enforcement of the law declaring war and the acts mentioned and other acts passed to make it effectual.   The relator was not supporting the Constitution of the two sovereignties unless he supported also the laws on which the existence of the Constitutions thus depended.

The evidence shows as follows:   After the enactment of all these laws and while the United States was in a state of war for the furtherance of which they were enacted, the relator publicly denounced the war, publicly questioned the justice and constitutionality of the Conscription Act, publicly denied that it was right for the United States to send soldiers to France or that there was any justification for the war, publicly attacked the nation's allies and eulogized its enemies, and publicly defended the sinking of the Lusitania and the other German atrocities, which have filled the civilized world with horror.   He did all these things, not once only, but many times and in many environments.   He did them in his court room and in the rooms of the county officials, some of whom were charged with duties under the Conscription Act, until he became a nuisance to them and they refused to listen to him.   He did them in the presence of lawyers and doctors, who came to see him on public business.   He joined groups with people on the streets and did them there.   He did them at meetings of the school board and at social gatherings in the hearing of patriotic women.   He kept uttering these extraordinary views from the time the war began in April, 1917, until he was suspended from office in January, 1918, and no remonstrance availed to still his tongue.   His conduct reached the ears of many people in the county and became the subject of angry comment and the cause of popular criticism and dismay.

For offenses, less flagrant, men have been sent to Federal prisons during this war, and during the Civil War were banished or sentenced to death.   For a judge to be guilty of such exploits is not only a breach of the many appropriate statutes, Federal and state, but a violation of his oath of office to support the Constitution.   If the test is wrongdoing in office as such, a judge is guilty of wrongdoing in office who does not uphold the law, who questions its constitutionality at his own initiative, when no issue involving it is before him and who uses the prestige of

his office to discourage his country's defenders and to advance the cause of those who are in arms for its destruction.

BROWN, C. J.

Relator was the duly elected, qualified and acting judge of probate in and for the county of Dodge. On January 17, 1918, a petition in due form was duly presented to respondent as Governor of the state, asking for his removal on the ground of alleged malfeasance in the discharge of his official duties. No neglect of duty or nonfeasance was charged. Subsequent proceedings, which were in all things regular, resulted in an order granting the prayer of the petition and removing relator from his said office. The proceedings and the order of removal were brought to this court for review on a writ of certiorari issued on the petition of relator.

Assignments of error challenge: (1) The jurisdiction of the Governor to entertain the removal proceedings at all, based on the contention that a judge of probate is not subject to removal by him, because not an inferior officer within the meaning of section 2 of article 13 of the state Constitution and therefore improperly included in section 5724, G. S. 1913, which grants the only authority the Governor has in the premises; (2) the competency of certain evidence which was received and considered by the Governor over the objection of relator. But as our conclusion on the merits of the case is that sufficient legal grounds for removal are not established by the evidence, as reduced and embodied in the findings of the Governor, it becomes unnecessary to consider the other questions and we pass them without comment or discussion.

Section 2 of article 13 of the Constitution provides that:

"The legislature of this state may provides for the removal of inferior officers from office, for malfeasance or nonfeasance in the performance of their duties."

Pursuant to the authority thus conferred upon it the legislature enacted section 5724, G. S. 1913, and thereby granted to the Governor the power to remove any of the officers therein named, including the judge of probate.

"Whenever it appears to him, by competent evidence, that either has

been guilty of malfeasance or nonfeasance in the performance of his official duties."

The language of the statute, as will be noticed, follows that of the Constitution, except that the word "official" is inserted before the word "duties," thus perhaps emphasizing the character of misconduct for which a removal may be made, though there would seem to be no difference in point of substance.

The facts made the basis of the order complained of and upon which the Governor acted, as stated and expressed in the order of removal, are as follows:

(1) That James F. Martin is the duly elected and qualified Judge of Probate of Dodge county, in the state of Minnesota.

(2) That since the United States has entered the war with the empire of Germany, the respondent has made, on numerous occasions and to divers people in public places, and elsewhere, the following statements:

"(1) That this is not our war, but England's war.

"(2) That we had no business in the war and that there was no reason for us going into the war.

"(3) That we didn't get any true opinions from the press, and the reports of atrocities were fabricated for the purpose of embittering the Americans against Germany.

"(4) That Germany was justified in sinking the Lusitania.

"(5) That we didn't have the right to send our boys across the water, and that the draft laws should never have been passed.

"(6) That the whole war is wrong.

"(7) That the President kept us out of war as long as he did simply for the political effect, until he was elected, and then declared war."

It may be said in further explanation of the case, that relator is an American citizen, 68 years of age, and has resided in Dodge county for upwards of 40 years. He has taken a prominent part in public affairs, and has held the office of judge of probate by repeated re-elections for the past 16 years; the duties of which so far as we are advised by the record have been performed with fidelity and to the entire satisfaction of the people of the county. His personal character is vouched for by his neighbors, including those who gave testimony against him in this

proceeding. His sympathy has been strongly with Germany in the present war, whether by reason of hostility to England or other reasons is not important, and he has frequently so expressed himself, at his office and upon public streets, in language, emphatic speech, and in a tone of voice that left no doubt in the minds of those with whom he talked of his opposition to the war policy of this country. He may have acted in good faith, and in the belief that he was within his rights as an American citizen, but conceding the truth of the evidence against him, the record justifies the statement that his conduct, if nothing more serious, was at least clearly at variance with good citizenship, and contrary to the obligations every citizen owes to the government of his country.

The only question presented is whether the facts, as found by the Governor and explained and enlarged by the statement just made, constitute malfeasance in the performance of relator's official duties sufficient in law to justify his removal. We answer the question in the negative.

The only authority in this state for the removal of an elective public officer, of the class to which the office of judge of probate belongs, so far as this case is concerned, is that granted and conferred by the provisions of the Constitution and statutes above quoted. The authority so granted is exclusive and renders inapplicable any remedy which, in the absence of statute, may perhaps exist at common law. The authority thus conferred limits the grounds of removal to acts constituting malfeasance in the performance of official duties, or such a failure to perform the duties as will constitute nonfeasance in office. Malfeasance in office, the basis of this proceeding, sometimes expressed as "misconduct in office," has a well defined and a well understood meaning, and refers to and includes only such misdeeds of a public officer as affect the performance of his official duties, to the exclusion of acts affecting his personal character as a private individual; the character of the man must be separated from his character as an officer. Mechem, Pub. Officers, § 457; Throop, Pub. Officers, § 367; Craig v. State, 31 Tex. Cr. R. 29, 19 S. W. 504; State v. Kuehn, 34 Wis. 229; Com. v. Williams, 79 Ky. 42, 42 Am. Rep. 204; Dullam v. Williamson, 53 Mich. 392, 19 N. W. 112, 51 Am. Rep. 128; State v. Welsh, 109 Iowa, 19, 79 N. W. 369.

In some jurisdictions the language of statutes granting the right of removal has been held broad enough to include misconduct wholly dis-

141 M.—21.

connected with the performance of official duties, but none of the courts have so construed or extended statutory authority couched in such plain and specific language as that found in the statutes of this state. The misconduct or malfeasance under our law must have direct relation to and be connected with the "performance of official duties," and amount either to maladministration, or to wilful and intentional neglect and failure to discharge the duties of the office at all. This does not include acts and conduct, though amounting to a violation of the criminal laws of the state, which have no connection with the discharge of official duties. A situation of that kind is covered by subdivision 5 of section 5723, G. S. 1913, wherein it is provided that the conviction of the incumbent of a public office of an infamous crime, or of any offense involving a violation of his official oath, shall of itself operate as a removal of the officer so convicted; the declaration of the statute is that the office shall upon such conviction become vacant. That statute, however, has no application to the case, for relator has not been prosecuted or convicted either of sedition, as defined by chapter 463, p. 764, Laws 1917, or of any other crime. State v. Common Council of City of Duluth, 53 Minn. 238, 55 N. W. 118, 39 Am. St. 595; Bagg's Case, 11 Coke, 93b; Lancaster v. Hill, 136 Ga. 405, 71 S. E. 731, Ann Cas. 1912C, 272, and note.

Just what acts or conduct would bring a particular case within the statute we do not stop to consider. Though it may be remarked, without deciding the point, that as to an officer who is charged by law with the duty of enforcing and maintaining law and order, it is probable that conduct similar to that charged against relator would constitute misconduct in the performance of official duties, and be ground for removal under the statute. But we are clear that scolding the President of the United States, particularly at long range, condemning in a strong voice the war policy of the Federal authorities, expressing sympathy with Germany, justifying the sinking of the Lusitania, by remarks made by a public officer of the jurisdiction and limited authority possessed by the judge of probate under the Constitution and laws of this state, do not constitute malfeasance in the discharge of official duties and therefore furnish no legal ground for removal.

We therefore find no sufficient basis for the removal of relator from

his office, and the order of the Governor removing him must be vacated and set aside. State v. Eberhart, 116 Minn. 313, 133 N. W. 857, 39 L.R.A.(N.S.) 788, Ann. Cas. 1913B, 785. Subdivision 5, § 3, of chapter 261, p. 375, Laws 1917 (the Safety Commission Act), has no application. The removal proceedings were had under G. S. 1913, § 5724.

It is so ordered.

On February 4, 1919, the following opinion was filed:

PER CURIAM.

In proceedings under section 5724, G. S. 1913, for the removal of a public officer for misconduct in office, the officer proceeded against is not entitled to costs and disbursements against the Governor, where an order of removal is vacated and set aside by the supreme court on certiorari proceedings. Nor is he entitled to costs and disbursements against the persons who petitioned the Governor to institute the removal proceeding. Proceedings of this kind are solely in the public interest and those who may join, by petition or otherwise, in urging the Governor to commence the same do not thereby become parties to the record nor subject themselves to the payment of costs on the dismissal or other unfavorable termination thereof.

The clerk's taxation of costs is therefore reversed.