Patsy MADSEN, Gerald Lewis, Shirley Cowdell, Bonnie Wallace, and David A. Wallace, Plaintiffs and Respondents,

v.

Keith BROWN, Defendant and Appellant.

No. 19478.

Supreme Court of Utah.

June 5, 1985.

Douglas J. Parry, Michael M. Later, Salt Lake City, for defendant and appellant.

Barrie A. Vernon, Tooele, for plaintiffs and respondents.

CULLEN Y. CHRISTENSEN, District Judge:

Pursuant to U.C.A., 1953, §§ 77–6–1 to –9, adopted in 1980, appellant, the mayor of Grantsville, was removed from office upon the jury's determination that appellant's participation in the killing of dogs constituted sanctionable "malfeasance in office." Appellant contends that removal proceedings are "quasi-criminal" in nature and seeks clarification as to his right against self-incrimination and his right to a unanimous verdict in such proceedings. Appellant also asserts that the jury applied the wrong standard of "malfeasance in office" because both the jury instructions and counsel's closing arguments allegedly suggest that appellant could be removed from office without a showing that he was acting under a specific mayoral duty when the alleged wrongful acts or omissions occurred.

On appeal, appellant seeks an order vacating the judgment of removal and reinstating him as mayor. Alternatively, he seeks a new trial.

On July 22, 1982, Officer Candelaria of the Grantsville City Police Department picked up four loose dogs after receiving a citizen's complaint. Loose dogs were customarily disposed of at appellant-mayor's farm. While Candelaria and Police Chief Maycock were enroute to the farm, they saw appellant in downtown Grantsville. They stopped and told appellant where they were going, and appellant decided to accompany them. Upon arrival at the farm, Maycock shot and killed three dogs, and appellant shot and killed one dog (allegedly to demonstrate the quickest and most humane method to destroy the animals).

On July 27, 1982, Wayne Madsen discovered the carcass of his dog on appellant's property, along with the remains of several other dogs. Madsen invited reporters and investigators to the site, whereupon appellant, assisted by Maycock, removed the carcasses from the farm.

Appellant pleaded *nolo contendere* to a class B misdemeanor charge of cruelty to animals. Five Grantsville citizens initiated the present action, alleging that the misdemeanor constituted grounds for removal from office. The petition was later amended to charge appellant with theft, conspir-

acy, obstruction of justice, illegal sale of property, obstruction of the collection of municipal fees, and malfeasance in office. All charges were dismissed except the issue as to whether appellant's actions constituted malfeasance in office sufficient to justify removal.

Prior to trial, appellant moved for summary judgment on the malfeasance in office charge on the grounds that there were no disputed facts and that any misconduct by appellant was performed in his private rather than his official capacity. The motion was denied, and the case went to trial. At the conclusion of the presentation of evidence, appellant moved for a directed verdict, alleging that no evidence had been introduced that appellant had any official duty with respect to animal control. This motion was also denied, and the jury returned a verdict of guilty. Subsequent motions for judgment notwithstanding the verdict or a new trial were also denied. Pursuant to the judgment of guilty of malfeasance in office, appellant has been removed from office.

### Removal Procedures

■ Appellant asserts that the trial court committed reversible error by denying appellant the right against self-incrimination and instructing the jury that appellant could be removed from office by a less-than-unanimous verdict. Respondents contend that neither issue was properly preserved for appeal. Under long-standing principles recently reiterated in several Utah cases,[1] issues not raised by the parties at the trial court level will not be considered for the first time on appeal. Because the record is devoid of any indication that appellant asserted the right against self-incrimination or was denied the protections afforded by the right, the self-incrimination issue is not properly before this Court.

■ Respondents also urge that the issue as to whether the removal of an officer requires a unanimous verdict was not prop-

erly preserved for appeal because appellant failed to exercise his right to poll the jury under Rule 47(q) of the Utah Rules of Civil Procedure. Rule 47(q) was not intended to impose such a requirement, nor does it contemplate the situation now before this Court. The clear intent of the polling provision is to allow the parties the opportunity to ensure that the requisite number of jurors concurred in the verdict. It is not a vehicle to bring into issue the court's instruction as to the number of concurring jurors required to reach a verdict. Appellant's timely objection to the instruction that a plurality of six of eight jurors was required to reach a verdict was therefore sufficient to preserve the issue for appeal.

The issue as to the number of jurors required to reach a verdict is an issue of law and as a result requires a standard of review as described in *Betenson v. Call Auto & Equipment Sales, Inc.*, Utah, 645 P.2d 684 (1982), and *Automotive Manufacturers Warehouse, Inc. v. Service Auto Parts, Inc.*, Utah, 596 P.2d 1033 (1979). Because this Court stands in as good a position as the trial court to determine this legal issue, this Court is not bound to defer to the trial court's determination as it would be if the issue were strictly factual.

■ Applying this standard, the Court first examines the origins of its removal authority. Paraphrasing language from *State v. Jones*, 17 Utah 2d 190, 195, 407 P.2d 571, 574–75 (1965), we restate the principle that the privilege of choosing and electing public officials and the attendant authority to repudiate them belong exclusively to the people. In order to preserve this fundamental privilege and the greatly valued balance of power between one branch of government and another, the Court may not act to remove a public officer unless the people have granted the Court clear legislative or constitutional authority to do so. The Court has no inherent authority to remove from office a duly elected public officer.

1. *See, e.g., Bangerter v. Poulton,* Utah, 663 P.2d 100 (1983); *Franklin Financial v. New Empire*

*Development Co.,* Utah, 659 P.2d 1040 (1983); *Burgers v. Maiben,* Utah, 652 P.2d 1320 (1982).

Accordingly, the Court must look to the Constitution of Utah and the removal statute to determine what role it is prescribed to play in removal proceedings. The Constitution of Utah does not empower the Court to remove public officers or prescribe procedures therefor. Rather, article VI, section 21 empowers the legislature to establish the manner in which officers may be removed: "All officers not liable to impeachment shall be removed for any of the offenses specified in this article [high crimes, misdemeanors, or malfeasance in office], *in such manner as may be prescribed by law.*" (Emphasis added.)

The legislature, as recently as 1980, exercised its sole prerogative to prescribe the manner by which a public officer may be removed from office. The new removal statute significantly alters the procedures prescribed under the former law. The new removal statute deletes, *inter alia,* the provision that a removal trial "must be by jury and be conducted in all respects in the same manner as the trial of an indictment or information for a felony." *See* U.C.A., 1953, § 77–7–11, repealed in 1980. Trial procedures in removal proceedings currently are established under U.C.A., 1953, § 77–6–7, as amended, which states as follows: "If the defendant denies the accusation or refuses to answer or appear, the court shall proceed to try the accusation. The rights of the parties and procedures used shall be the same as in any *civil* proceeding." (Emphasis added.)

The above statute apparently provides that appellant does not have a right to an instruction that differs from that to which he would be entitled in any civil proceeding. Under Rule 47(q) of the Utah Rules of Civil Procedure, a verdict in a civil proceeding only requires the concurrence of three-fourths of the jurors.

Appellant bases his contention that he was entitled to an instruction that a unanimous verdict was required for removal on the language of U.C.A., 1953, § 77–6–8, as amended, which states in part as follows: "If the defendant admits the accusation or is *convicted,* the court shall enter judgment

against him directing the defendant be removed from office and setting forth the causes of removal." (Emphasis added.)

Appellant asserts that the word "convicted" requires the application of criminal standards of proof, including both a beyond-a-reasonable-doubt standard and a unanimous verdict. Appellant also urges that *State v. Geurts,* 11 Utah 2d 345, 359 P.2d 12 (1961), and *State v. Jones, supra,* establish that removal procedures are "quasi-criminal" in nature, and therefore, the number of jurors required to remove an officer should be the same as in a *criminal* proceeding.

Appellant points to the substantial reputational interests of the accused in a removal proceeding and suggests that because a removal judgment declares the accused unfit to retain the public trust, rather than merely assessing money damages, the accused is entitled to criminal procedure safeguards. Appellant also points to the public's interest in protecting its duly elected public officers. He argues that because a removal action allows the voice of only a few citizens to negate the vote of the electorate, the jury should be required to be unanimous in its decision.

■ Removal proceedings, however, are statutory proceedings not of common law origin. *State v. Jones,* 407 P.2d at 572. Where the legislature has clearly spoken as to the procedures to apply to removal trials and the constitutionality of the statute is not at issue, the Court is not at liberty to consider the wisdom of such procedures or apply procedures that conflict with the clear intent of the legislature. The Court, when discussing the "quasi-criminal" nature of removal proceedings in *Geurts* and *Jones* was interpreting the former removal statute, rather than prescribing removal procedures, which is the sole prerogative of the legislature.

Therefore, the Court looks to the rules of statutory construction to resolve the apparent contradiction between section 77–6–7 and section 77–6–8. In cases of apparent conflict between provisions of the same statute, it is the Court's duty to harmonize

and reconcile statutory provisions, since the Court cannot presume that the legislature intended to create a conflict. Where contradictory provisions are passed, the provision susceptible of but one meaning will control those susceptible of two if the statute can thereby be rendered harmonious. 73 Am.Jur.2d *Statutes* §§ 254, 255 (1974).

There seems to be no double meaning in section 77–6–7. However, the term "convicted" in section 77–6–8 is susceptible of two meanings, one of which would reconcile it with section 77–6–7. The term "convicted" from section 77–6–8, considered in context, could reasonably be interpreted to mean a determination by the court that the accusations constituting the basis for removal were true, as opposed to the alternative basis for judgment of removal, the defendant's admission.

This interpretation reconciles the two provisions and is a more reasonable assessment of legislative intent than the interpretation urged by appellant. Appellant urges that the term "convicted" determines the rights of the parties and procedures at trial in conflict with the preceding provision passed for that very purpose. Section 77–6–7 specifically addresses the issue of the rights and procedures to be used to try the accusations that form the basis of removal, whereas section 77–6–8 deals with the court's responsibility once it has been determined that the accusations are true.

■ It is a long-standing rule of statutory construction that a provision treating a matter specifically prevails over an incidental reference made thereto in a provision treating another issue, not because one provision has more force than another, but because the legislative mind is presumed to have stated its intent when it focused on that particular issue, 73 Am. Jur.2d *Statutes* § 255 (1974). The Court concludes, therefore, that the legislature clearly prescribed that the rules of civil procedure apply to removal trials and that the trial court did not err in refusing the instruction that a unanimous verdict was required to remove a public officer.

## Standard of Malfeasance in Office

Appellant's remaining contentions relate to the trial court's alleged application of an improper standard of "malfeasance in office." Appellant contends that the trial court erred in giving the jury inconsistent and improper instructions regarding the standard of malfeasance in office and in allowing respondents' counsel in his closing argument to urge the jury to apply an incorrect standard. He also alleges error in that the evidence is legally insufficient to support the jury's verdict under the proper standard of malfeasance in office. Appellant contends, therefore, that failure to grant his motions for summary judgment, directed verdict, judgment notwithstanding the verdict or new trial constituted reversible error. These errors allegedly permitted him to be removed from office for misconduct unrelated to his official duties.

According to Rule 61, Utah Rules of Civil Procedure, the judgment of the trial court should not be disturbed unless the alleged errors were "substantial and prejudicial." Such an assessment requires definition of the proper standard of malfeasance in office. In *State v. Geurts, supra,* this Court, while rejecting an argument that the term "malfeasance in office" was unconstitutionally vague, stated as follows:

> On the contrary, by usage the phrase "malfeasance in office" has acquired a commonly understood meaning: it requires an intentional act or omission *relating to the duties of a public office,* which amounts to a crime, or which involves a substantial breach of the trust imposed upon the official by the nature of his office, and which conduct is of such a character as to offend against the commonly accepted standards of honesty and morality.

11 Utah 2d at 348, 359 P.2d at 14.

The question as to whether appellant's activities "amount[ed] to a crime" was dismissed by the trial court and therefore is not at issue.

■ Appellant's arguments focus on the interpretation of the requirement that the acts or omissions relate to the duties of the office. He contends that in order to establish the offense of malfeasance in office, the acts or omissions must occur in the course of some *specified official duty as defined by statute or ordinance.*

The standard urged by appellant does not coincide with the commonly understood meaning of the term "malfeasance in office" or the intent of removal statutes to protect and preserve the office and to free the public of unfit officers. *State v. Schroeder*, 199 Kan. 403, 430 P.2d 304 (1967); *State v. Jones*, 407 P.2d at 572.

There is a range of conduct that can occur while an officer is acting under color of office, but outside any specified official duty as defined by statute or ordinance that sufficiently relates to the duties of office so as to taint the office itself or establish that a particular officer is unfit to retain the public trust. This range of conduct is included in the commonly understood meaning of malfeasance in office. R. Perkins, *Perkins on Criminal Law* 487 (2d ed. 1969) states that malfeasance in office can occur when an officer exercises official duties or acts under color of office. The term "under color of office" is further defined in R. Perkins, *supra*, at 483: "The act of one who is an officer, which act is done because he is an officer or because of the opportunity afforded by that fact, is under color of his office."

The object of the requirement that the act or omission relate to the duties of the public office is to ensure that an official is not removed for malfeasance in office when the alleged wrongful acts or omissions occurred while the officer was acting in his private capacity as opposed to his capacity as a public officer. This requirement has not been interpreted to preclude removal where the official was acting in his public capacity outside specifically defined duties of his office. The question as to whether the alleged misconduct occurred while the accused was acting in his public, as opposed to his private, capacity is a question to be decided by the trier of fact based on all the evidence, not merely on the evidence as to the specific duties as created by statute or ordinance.

■ Having further defined "malfeasance in office," this Court now examines the jury instructions and closing arguments to determine if there is a reasonable likelihood that the jury applied the wrong standard. Appellant's specific claim of error is that the instructions infer that appellant could be removed from office for any violation of law or for allowing another to commit any violation of law because Instruction No. 13, which was the only statement of the mayor's duties, indicated as follows: "You are instructed that under Grantsville City ordinances a mayor shall perform all duties which are or may be prescribed by law or ordinance and shall see that the laws and ordinances are faithfully executed."

Instruction No. 13 then proceeds to tell the jury that animal control is the responsibility of the chief of police rather than the mayor, implying that the mayor did not have any specific duties in that area.

You are further instructed that under Grantsville City ordinances, it is the duty of the Chief of Police to take up and impound all dogs whether licensed or not, found running at large within the corporate limits of the city, or any dogs within the corporate limits of the city that are not wearing collars with the registration plate attached.

The reasonable import of this instruction is to allow the jury to conclude that appellant was not acting under a specific mayoral duty, rather than to remove from the jury the issue as to whether the appellant was acting as mayor when the alleged misconduct occurred. Instruction No. 13, therefore, may have violated the strict standard of malfeasance in office urged by appellant's counsel, that removal requires a breach of a specifically defined mayoral duty but, considered in light of other instructions, did not contradict the commonly understood meaning of the term as described herein.

Whatever error could have occurred from an isolated reading of Instruction No. 13 was cured by Instruction Nos. 10, 12, 13a, 14 and 17a. Instruction No. 14 clearly and accurately stated that the instructions were to be considered as a whole: "You are not to single out any certain sentence, or any individual point or instruction, and ignore the others, but you are to consider all the instructions as a whole and to regard each in light of the others." Instruction Nos. 10,[2] 12,[3] and 17a[4] required proof beyond a reasonable doubt that the alleged misconduct occurred while appellant was acting in his capacity as mayor. Instruction No. 13a[5] provided clear protection against the misconception cited by appellant that he could be removed for any violation of law under his general duty to "see that the laws and ordinances are faithfully executed." Absent a showing of criminality, the instruction imposed the requirement that the misconduct must involve "a substantial breach of the trust imposed upon the official by the nature of his office." Therefore, this Court finds no prejudicial inconsistency between the proper standard of malfeasance in office and the instructions taken as a whole.

On the basis of these instructions, this Court also concludes that there is no reasonable likelihood that the jury verdict would have been different absent the allegedly prejudicial closing arguments of respondents' counsel. Although the arguments may have implied that appellant could be removed for any violation of law, the instructions effectively precluded reaching a verdict on that basis.

### Sufficiency of the Evidence

■ The sole remaining issue is whether the evidence is legally sufficient to support the finding that the alleged misconduct occurred while appellant acted in his capacity as mayor. Because this was a factual determination, this Court may reverse the jury's verdict only if that verdict is without foundation in the evidence or is based on evidence so fragmentary that no reasonable minds could have so concluded. *Prince v. Peterson,* Utah, 538 P.2d 1325 (1975). *See also Groen v. Tri-O-Inc.,* Utah, 667 P.2d 598 (1983); *E.A. Strout Western*

**2.** Instruction No. 10:
> You are instructed that under our law a court may remove certain officials from office for malfeasance in office. A mayor of a city such as Grantsville is one of the officers who may be so removed.
>
> Because a jury of only a few citizens can remove an official who was elected by many citizens, however, the law requires great caution in such a proceeding. For this reason the charge of malfeasance in office requires proof beyond a reasonable doubt.

**3.** Instruction No. 12:
> If you find Mayor Brown guilty of malfeasance, to further find that the malfeasance was committed in the course of Mayor Brown's duties as mayor, you must conclude that Brown, in fact, was acting as mayor rather than in his private capacity when he committed that offense.
>
> Commission of a crime or misconduct unrelated to official duties does not constitute malfeasance in office; rather you may find Keith Brown guilty of malfeasance in office only if you conclude that any misconduct on his part clearly occurred during the course of his duties as mayor rather than for his own purposes.

**4.** Instruction No. 17a:

> In order to find the defendant Keith Brown guilty of malfeasance in office you must be convinced beyond a reasonable doubt that each of the following is true:
>
> 1. That the acts Mayor Brown is charged with were committed by him; and
> 2. That they were of such a character as to constitute "malfeasance" as that term will be defined herein; and
> 3. That they were committed in the course of his duties as mayor.
>
> If you do not find beyond a reasonable doubt each of these and all of them are true, then you must return a verdict in favor of the defendant.

**5.** Instruction No. 13a:
> The term "malfeasance" means evil doing; ill conduct or the commission of some act which is positively unlawful with knowledge at the time that it was so. Malfeasance requires an intentional act or omission relating to the duties of the public office, which amounts to a crime, or which involves a substantial breach of the trust imposed upon the official by the nature of his office, and which conduct is of a character as to offend against the commonly accepted standards of honesty and morality.

*Realty v. W.C. Foy & Sons,* Utah, 665 P.2d 1320 (1983); *Ute-Cal Land Development Corp. v. Sather,* Utah, 605 P.2d 1240 (1980).

Applying this standard, the evidence is sufficient to support the jury's conclusion that the alleged misconduct occurred while appellant acted in his capacity as mayor. The mayor was present at City Hall when the complaint about the dogs was discussed. It could reasonably be inferred from the evidence that Officer Candelaria and Chief Maycock stopped on their way to appellant's farm to report to the mayor that the complaint had been resolved. It could also reasonably be inferred from the evidence that although appellant had no specific duty in the area of animal control, because of his position as chief executive officer of the city, he exercised his discretion to "supervise" or assist in disposing of the dogs. The evidence also supports the conclusion that when approached in his capacity as mayor by one of the dog owners, appellant failed to explain what had happened. Appellant and the police chief later removed the carcasses from appellant's property in what the jury could reasonably have concluded was an effort to avoid public view. In light of the foregoing evidence, no error was committed in the denial of appellant's motions.

Accordingly, the judgment of the trial court is affirmed.

HOWE, Justice, concurs.

ZIMMERMAN, Justice (concurring in the result):

Although I concur with the result reached by the majority, I must also express considerable support for the concerns expressed by the dissent. A duly elected public official must not be subject to removal simply because his or her popularity wanes. Nor should an elected official's minor pecadillos provide a basis for removal. Judicial removal of an elected official is a remedy that should be available only

when that official's conduct clearly establishes that he or she is unfit to hold office. In my view, the evidence here adequately establishes Mayor Brown's unfitness to hold office.

The uncontradicted evidence established that the mayor was present when the dogs were killed, although he was aware that a complaint about them had been made only that morning. The evidence also established that killing the dogs was unlawful. But more importantly, testimony at trial established that the mayor lied and actively attempted to conceal his knowledge of the animals' fate, as well as the evidence of his participation in their destruction. Under these circumstances, there is ample record evidence to support the jury's conclusion that the mayor's conduct constituted malfeasance.

STEWART, Justice (dissenting):

The majority holds that a duly elected mayor of a city may be removed from office by a court decree because he shot and killed a dog that had been running loose in the city. Utah Code Ann., 1953, § 77–6–1, which the majority holds authorizes that result, was never intended, in my view, to permit a court to nullify an election on such flimsy grounds. Because the Court construes § 77–6–1 to permit a handful of citizens to override the voice of the majority on such frivolous grounds, I dissent.

Section 77–6–1, which is part of the criminal procedure code, provides for the removal of individuals who are unfit to serve in public office. It states: "All justices of the peace and all officers of any city, county or other political subdivision of this state not liable to impeachment shall be subject to removal as provided in this chapter *for high crimes and misdemeanors or malfeasance in office.*" (Emphasis added.) Formerly, actions for removal had to be initiated by grand juries, district attorneys, or county attorneys.[1] The current statute allows taxpayers to initiate such actions.[2]

1. Section 77–7–2 (repealed, 1980 Utah Laws, ch. 15, § 1) stated:

An accusation in writing against any district, county, precinct or municipal officer, or an

Removal statutes are quasi-penal in character and should be strictly construed. *State v. Probate Court*, 22 Ohio St. 2d 120, 258 N.E.2d 594 (1970); C. Rhyne, *The Law of Local Government Operations* § 13.46 at 274 (1980). Removal is intended for those rare occasions when an official, because he has committed an act so morally reprehensible or offensive to accepted standards of honesty and integrity, shows himself to be an unfit steward of the public trust. *State v. Jones*, 17 Utah 2d 190, 193–94, 407 P.2d 571, 573 (1965). The purpose of the removal statutes is not to authorize judicial removal of unpopular, disliked, or thoughtless public officials. The election process is a sufficient remedy in such cases. If the rule were otherwise, disgruntled citizens could use the courts to nullify the results of an election, interfere in the administration of governmental affairs to an intolerable extent, and otherwise interfere with the political process. Vigorous, effective municipal government can hardly thrive in such an environment. Furthermore, reputable, civic-minded persons will be deterred from agreeing to serve the public if their names can be so easily blackened.

The issue in this case is whether the mayor of Grantsville violated § 77-6-1 by committing "malfeasance in office," since his action clearly does not qualify as a "high crime and misdemeanor." Even assuming that Mayor Brown acted in his official capacity when he participated in disposing of the dogs, the question is whether that conduct shows that he is unfit to act as mayor. Malfeasance in office has nothing to do with an official's acts affecting only his personal character as a private individual; "the character of the man must be separated from his character as an offi-cer." *State ex rel. Martin v. Burnquist*, 141 Minn. 308, 170 N.W. 201, 203 (1918). Rather, the issue is whether the official, acting in his official capacity, committed an illegal or wrongful act of such culpability as to constitute a substantial abuse of the office he holds. *See Law v. Smith*, 34 Utah 394, 415, 98 P. 300, 308 (1908); *State ex rel. Hardie v. Coleman*, 115 Fla. 119, 155 So. 129, 132 (1934); 63A Am. Jur. 2d *Public Officers and Employees* § 246 (1984); *cf.* cases noted at 26 *Words and Phrases* 183–84 (1953).

Not every illegal, wrongful, or unjust act that may be committed by a public official amounts to malfeasance in office. This Court has stated that malfeasance in office means "an intentional act or omission relating to the duties of a public office, which amounts to a crime, or which involves a substantial breach of the trust imposed upon the official by the nature of his office, and which conduct is of such a character as to offend against the commonly accepted standards of honesty and morality." *State v. Geurts*, 11 Utah 2d 345, 348, 359 P.2d 12, 14 (1961). Malfeasance must also have "a direct relation to the performance of official duties and must amount to either maladministration or willful and intentional neglect and failure to discharge the duties." C. Rhyne, *The Law of Local Government Operations* § 13.46 at 273–74 (1980).

Malfeasance requires an evil or criminal intent, a conscious wrongdoing. McQuillin states:

[T]he courts have prevented the common-law crime of misconduct in office from becoming a means for oppressive prosecutions premised upon vague moral principles by making wilfullness an element of the crime. Wilfulness ... means, in the context of malfeasance arising out of

---

officer of any board of education, for any high crime, misdemeanor or malfeasance in office may be presented to the district court by the grand jury or by the district attorney, or by the county attorney of the county in which the officer accused was elected or appointed.

**2.** Section 77–6–2 states:

An action for the removal of a justice of the peace or officer of a city, county, or other political subdivision of this state shall be commenced by presenting a sworn, written accusation to the district court. The accusation may be initiated by any taxpayer, grand jury, county attorney for the county in which the officer was elected or appointed, or by the attorney general.

the breach of a duty of public concern, an evil purpose or mental culpability, ... guilty knowledge, mens rea, bad purpose, or corruption.

4 E. McQuillin, *Municipal Corporations* § 12.237 at 265 (footnotes omitted). The law presumes that a public official conducts himself in good faith, and the burden to show evil intent rests on the complainant. *Id.*

The nature of the misconduct which the term "malfeasance" was intended to reach is suggested by the words in the statute which precede the word malfeasance, i.e., "high crimes and misdemeanors." *State v. Jones*, 17 Utah 2d at 194, 407 P.2d at 573. "Malfeasance in office" does not require conduct so culpable as high crimes and misdemeanors, but it clearly does require conduct that seriously interferes with one's proper discharge of official duties.

Malfeasance requires more than an error of judgment or a minor violation of duty or of the law. Acts which the courts have held do not constitute sufficient grounds for removal include failure by a mayor to report liquor law violations to the county attorney, *State v. Corwine*, 113 Kan. 192, 213 P. 658 (1923); a mayor's failure to report a police chief's violations of duty and his false denial of knowledge thereof, *McDonald v. Brooks*, 215 Tenn. 535, 387 S.W.2d 803 (1965); and gambling by a city marshall, *Mayor and Council of Macon v. Shaw*, 16 Ga. 172 (1854). *See also* cases noted at 4 E. McQuillin, *Municipal Corporations* § 12.237a at 271–72 n.22 (1979); C. Rhyne, *The Law of Local Government Operations* § 13.46 at 275 (1980). Conduct which has been held to constitute malfeasance in office must demonstrate unfitness or untrustworthiness in fulfilling the duties of office, such as acting with a conflict of interest when dealing with government contracts, committing perjury or falsifying records, filing false reports, and making personal use of municipal property. 4 E. McQuillin, *supra*, at § 12.237a; *cf.* C. Rhyne, *supra*, § 13.46 at 274–75.

Mayor Brown's acts simply do not, in my judgment, constitute malfeasance in office, as a matter of law. For all that appears in the record, Mayor Brown's error seems to have been that he became more involved in trying to solve a community problem than he needed to be, even though he may well have used poor judgment in disposing of the dogs. In truth, the owners of the dogs which were allowed to run loose were primarily at fault in the first instance, and given the finding that loose dogs were customarily disposed of in the manner that occurred in this case and that the City of Grantsville has no dog pound, one might wonder what alternative course of action there was.

Finally, the evidence shows no evil intent. The mayor simply acted to solve a community problem. He received no personal benefit from his actions. Perhaps his actions were both wrong and harsh, but, if so, that was not a sufficient ground for removing him from office and short-circuiting the electoral process.

DURHAM, concurs in the dissenting opinion of STEWART, J.

HALL, C.J., having disqualified himself, does not participate herein; CULLEN Y. CHRISTENSEN, District Judge, sat.