2000 UT 19

John LYON, individually and as guardian of Matthew J. Lyon, a minor, and Chris Jacob Walker, individually and as guardian for Christopher Michael Walker, a minor, Plaintiffs, Appellants, and Cross–Appellees,

v.

Glen H. BURTON, Weber Fire District, and Weber County, Defendants, Appellees, and Cross–Appellants.

Nos. 950515, 950516.

Supreme Court of Utah.

Jan. 19, 2000.

Order Modifying Opinion on Denial of Rehearing June 30, 2000.

E. Scott Savage, Salt Lake City, for plaintiffs.

Ray R. Christensen, David C. Richards, Salt Lake City, for Burton and Weber Fire District.

Robert R. Wallace, Salt Lake City, for Weber County.

Gary B. Ferguson, Salt Lake City, for North View Fire Department.

STEWART, Justice:

## I. FACTS

¶ 3 This case arose from the collision of an automobile driven by Chief Glen H. Burton of the Weber Fire District ("District") and an automobile in which Matthew J. Lyon and Christopher M. Walker were riding. Lyon and Walker, both minors, were severely injured and through their fathers, sued Chief Burton and the Weber Fire District. A jury found that defendants Burton and the District were 100 percent at fault in causing the accident and awarded Matthew Lyon $700,000 in general damages and $9,537.79 in special damages, and Christopher Walker $900,000 in general damages and $132,932.39 in special damages.

¶ 4 On the day of the accident, Chief Burton heard a report of a fire in the North View Fire District, which borders the Weber Fire District. After listening to additional reports on the fire's progress, Chief Burton decided to proceed to the fire. En route, he switched his Ford Explorer to "emergency" mode, which entailed turning on the vehicle's emergency lights and siren. Although the Explorer had intentionally not been accoutered to look like an emergency vehicle,[1] it was equipped with emergency lights mounted behind the grill, a siren mounted behind the front bumper, and a portable light that could be placed on the dashboard.

¶ 5 While proceeding in emergency mode, Chief Burton entered an intersection against a red light and collided with plaintiffs, who had the green light. He estimated that his speed immediately prior to the accident was from ten to fifteen miles per hour up to thirty-five to forty miles per hour. Both plaintiffs were severely injured. Matthew Lyon sustained a closed head injury for which relatively little medical treatment was required or possible but which resulted in significant and permanent brain damage. Christopher Walker sustained brain damage and also severe physical injuries.

¶ 6 Plaintiffs filed suit against Chief Burton and the District. Prior to trial, defendants moved to dismiss the action against Chief Burton in his individual capacity on the ground that he was acting within the scope of his duties for the District at the time the accident occurred. Thus, defendants argued that suit against Chief Burton was barred under Utah Code Ann. § 63-30-4 (1993)[2] of the Governmental Immunity Act (the "Act"), which gives total immunity to government employees for negligence in the course and scope of their employment. The trial court deferred ruling on this motion until after trial, and then granted it.

¶ 7 Both defendants also moved for summary judgment on the ground that the general waiver of governmental immunity for damage caused by negligence under section 63-30-10 was not applicable because subsection (18)(b) of section 63-30-10 retained governmental immunity for fire fighting activi-

---

1. Chief Burton testified at trial that the Explorer had been disguised for two reasons. First, Chief Burton was authorized to use the vehicle for both personal use and to pick up supplies needed by the District, and the District was concerned that citizens would complain if they observed the vehicle parked at stores or while being used by Chief Burton for personal uses. Second, the District wanted to be able to use the vehicle for stakeouts during arson investigations.

2. All citations to Utah Code Annotated refer to the 1993 edition unless otherwise indicated.

ties. Defendants maintained that Chief Burton was engaged in fire fighting activities at the time of the collision. The trial court did not formally deny the motion, but the case proceeded to trial.

¶ 8 Following the jury verdicts, the trial court granted defendants' pretrial motion to dismiss Chief Burton as a party defendant and the District's motion to limit the damages award against the District to $250,000 for each plaintiff pursuant to Utah Code Ann. § 63–30–34. The court denied plaintiffs' motions for judgment on the verdicts, prejudgment interest, and costs, but granted their motions for postjudgment interest. Thereafter, the District moved for a judgment notwithstanding the verdict (j.n.o.v.) on the ground that under subsection (18)(b) of section 63–30–10, the District was not liable for negligence in fire fighting activities. The court denied the motion.

¶ 9 Both parties appealed. Plaintiffs appealed (1) the order dismissing Chief Burton pursuant to section 63–30–4; (2) the limitation of their damages to $250,000 each pursuant to section 63–30–34; (3) the denial of prejudgment interest on their special damages under section 78–27–44; and (4) the denial of costs under Rule 54(d) of the Utah Rules of Civil Procedure. The District cross-appealed the trial court's denial of its motions for summary judgment and j.n.o.v. on the ground that it was entitled to complete immunity for fire fighting activities.

## II. GOVERNMENTAL IMMUNITY

■ ¶ 10 Defendants claim that sections 63–30–3(1) and 63–30–10(18)(b) of the Utah Governmental Immunity Act provide complete immunity in this case. We address this claim first because plaintiffs' other claims are relevant only if the Act does not provide complete immunity. Moreover, some of plaintiffs' claims are based on constitutional challenges, and " 'this Court should avoid addressing constitutional issues unless required to do so.' " *World Peace Movement of Am. v. Newspaper Agency Corp.*, 879 P.2d 253, 257 (Utah 1994) (quoting *State v. Anderson*, 701 P.2d 1099, 1103 (Utah 1985)).

■ ¶ 11 Defendants argue that the trial court erred in denying their motion for summary judgment and in denying the District's motion for j.n.o.v. Both motions were based on the argument that the District is immune from liability because sections 63–30–3(1) and 63–30–10(18)(b) together provide immunity to governmental entities that negligently cause injuries while engaged in "activities of . . . fighting fire." While the legal bases of both motions are the same, the standards by which the trial court is to evaluate the motions are different. Summary judgment "is appropriate only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *State Farm Mut. Auto. Ins. Co. v. Clyde*, 920 P.2d 1183, 1185 (Utah 1996). On the other hand, a motion for j.n.o.v. should be granted only when "viewing the evidence in the light most favorable to the prevailing party, the evidence is insufficient to support the verdict" as a matter of law. *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 799 (Utah 1991). We review a trial court decision on both a motion for summary judgment and a motion for j.n.o.v. for correctness. *See Johnson v. Redevelopment Agency*, 913 P.2d 723, 727 (Utah 1995) (summary judgment); *Crookston*, 817 P.2d at 799 (j.n.o.v.).

### A. Weber Fire District's Liability to Suit under Section 63–30–10 of the Governmental Immunity Act

■ ¶ 12 The District contends that the trial court erred in ruling that it was not immune from suit. Generally, it is appropriate to address liability issues, particularly the issue of whether a defendant owes a plaintiff a duty of due care, prior to addressing the affirmative defense of the defendant's immunity from suit. *See, e.g., Ledfors v. Emery County Sch. Dist.*, 849 P.2d 1162, 1163–64 (Utah 1993); *Rollins v. Petersen*, 813 P.2d 1156, 1162 (Utah 1991). Here, however, defendants in effect admit that Chief Burton owed a duty of care to plaintiffs and that that duty was breached. For that reason, we proceed directly to the issue of governmental immunity.

■ ¶ 13 *Ledfors* established a three-step analysis for determining whether a gov-

ernmental entity is entitled to immunity under the Act.

First, was the activity the entity performed a governmental function and therefore immunized from suit by the general grant of immunity contained in section 63–30–3? [Utah Code Ann. § 63–30–3(1).] Second, if the activity was a governmental function, has some other section of the Act waived that blanket immunity? Third, if the blanket immunity has been waived, does the Act also contain an exception to that waiver which results in a retention of immunity against the particular claim asserted in this case?

*Ledfors*, 849 P.2d at 1164.

■ ¶ 14 The first question, therefore, is whether driving an emergency vehicle to a fire is a "governmental function." This inquiry is mandated by section 63–30–3(1), which establishes the general principle of governmental immunity subject to certain exceptions. "Except as may be otherwise provided in this chapter, *all governmental entities are immune from any injury which results from the exercise of a governmental function.*" Utah Code Ann. § 63–30–3(1) (emphasis added). The District qualifies for this blanket grant of immunity if Chief Burton was engaged in a "governmental function" at the time of the accident. *See* Utah Code Ann. § 63–30–2(4)(a). Under this statutory definition, we conclude that driving an emergency vehicle to the scene of a fire is a "governmental function" and is therefore presumptively cloaked with immunity by section 63–30–3 of the Act.[3] *Cf. Rollow v. Ogden City*, 66 Utah 475, 243 P. 791 (1926) (stating that doctrine of respondeat superior will not apply to municipality acting in governmental capacity like fighting fires).

■ ¶ 15 The second issue under *Ledfors* is whether the Act provides an exception to that immunity. Section 63–30–10 provides a broad waiver of governmental immunity for negligent acts of an employee committed in the course and scope of employment. "Immunity from suit of all governmental entities is waived for injury proximately caused by a negligent act or omission of an employee committed within the scope of employment...." Utah Code Ann. § 63–30–10. Given the jury verdict, this waiver applies in this case.

■ ¶ 16 The next question is whether the Act contains an exception to that waiver. Section 63–30–10 has several subsections that exclude certain activities from the waiver and thereby retain immunity. Subsections 15 and 18(b) are two exceptions that are arguably applicable here. Section 10 states:

Immunity from suit of all governmental entities is waived for injury proximately caused by a negligent act or omission of an employee committed within the scope of employment except if the injury arises out of:

...;

(15) *the operation of an emergency vehicle, while being driven in accordance with the requirements of Section 41–6–14;*

...; or

(18) the activities of:

...;

(b) fighting fire....

*Id.* (emphasis added). These exceptions to the general waiver of immunity are in the alternative. Therefore, the District is immune from liability if either exception is satisfied. Although we have construed several of the exceptions in section 63–30–10 as to the waiver of immunity,[4] we have not previously addressed either subsection (15) or subsection (18).

---

3. For constitutional purposes, the scope of governmental immunity insofar as it may be subject to various provisions in the Declaration of Rights is a judicial, not a legislative, question. *See DeBry v. Noble*, 889 P.2d 428, 440 (Utah 1995).

4. *See, e.g., Nelson v. Salt Lake City*, 919 P.2d 568, 574–76 (Utah 1996) (interpreting discretionary function exception found in subsection 63–30–10(1) and natural condition exception found in subsection 63–30–10(11)); *Tiede v. State*, 915 P.2d 500, 502–03 (Utah 1996) (interpreting assault and battery exception found in subsection 63–30–10(2)); *Nixon v. Salt Lake City Corp.*, 898 P.2d 265, 270–71 (Utah 1995) (interpreting inspection exception found in subsection 63–30–10(4)).

¶ 17 In construing these subsections, we apply long-standing rules of statutory construction. "This court's primary objective in construing enactments is to give effect to the legislature's intent." *Gohler v. Wood*, 919 P.2d 561, 562 (Utah 1996) (citation omitted). The plain language of a statute is generally the best indication of that intent. *See Perrine v. Kennecott Mining Corp.*, 911 P.2d 1290, 1292 (Utah 1996). Therefore, "where the statutory language is plain and unambiguous, we do not look beyond the language's plain meaning to divine legislative intent." *Horton v. Royal Order of the Sun*, 821 P.2d 1167, 1168 (Utah 1991) (citation omitted). The plain language of a statute is to be read as a whole, and its provisions interpreted in harmony with other provisions in the same statute and "with other statutes under the same and related chapters." *Roberts v. Erickson*, 851 P.2d 643, 644 (Utah 1993) (per curiam) (citation omitted); *see also Silver v. Auditing Div.*, 820 P.2d 912, 914 (Utah 1991); *Osuala v. Aetna Life & Cas.*, 608 P.2d 242, 243 (Utah 1980). Furthermore, where possible "we . . . construe statutory provisions so as to give full effect to all their terms." *Schurtz v. BMW of N. Am., Inc.*, 814 P.2d 1108, 1112 (Utah 1991). Most pertinent here is the rule that a statute dealing specifically with a particular issue prevails over a more general statute that arguably also deals with the same issue. *See Madsen v. Brown*, 701 P.2d 1086, 1090 (Utah 1985).

¶ 18 Giving full effect to the language of subsections (15) and (18) and reading them in harmony with related statutes, it is apparent that only subsection (15) applies to the facts of this case. Subsection (15) applies to "the operation of an emergency vehicle," and that is precisely the activity in which Chief Burton was engaged at the time of the accident. Subsection (18)(b), on the other hand, is more general; it provides an exception to the waiver of immunity for "activities of . . . fighting fire." Standing alone, this provision could arguably apply to this case, but we conclude that because subsection (15) applies with greater specificity, it should govern. *See Madsen*, 701 P.2d at 1090.

¶ 19 This conclusion is bolstered by a detailed reading of subsection (15) and its reference to a provision of the Motor Vehicle Code. Subsection 63–30–10(15) provides that liability shall not attach for negligence if the injury arises out of "the operation of an emergency vehicle, while being driven in accordance with the requirements of Section 41–6–14." Utah Code Ann. § 63–30–10(15). At the time of the accident, section 41–6–14 provided:

(1) The operator of an authorized emergency vehicle, when responding to an emergency call or when in pursuit of an actual or suspected violator of the law or *when responding to but not upon returning from a fire alarm*, may exercise the privileges under this section, subject to Subsection (2).

(2) The operator of an authorized vehicle may:

(a) park or stand, irrespective of the provisions of this chapter;

(b) *proceed past a red or stop signal or stop sign*, but only after slowing down as may be necessary for safe operation;

(c) exceed the maximum speed limits if the operator does not endanger life or property; or

(d) disregard regulations governing direction of movement or turning in specified directions.

(3) Privileges granted under this section to an authorized emergency vehicle apply only when the vehicle sounds an audible signal under Section 41–6–146, or uses a visual signal as defined under Section 41–6–132, which is visible from in front of the vehicle.

(a) The privileges under this section do not relieve the operator of an authorized emergency vehicle from the duty to operate the vehicle with regard for the safety of all persons, or protect the operator from the consequences of an arbitrary exercise of the privileges.

*Id.* § 41–6–14 (1988) (emphasis added). This section specifically refers to the privilege of driving an emergency vehicle through a red light when responding to a fire alarm. Because those are precisely the circumstances of this case, subsection 63–30–10(15), which

incorporates section 41–6–14, is the more specific provision and therefore controls over subsection 63–30–10(18)(b).[5]

¶ 20 But whether subsection (15) in fact provides an exception to the waiver depends on whether Chief Burton's conduct complied with the requirements of that section. For the District to be immune under subsection 63–30–10(15), it must show that plaintiffs' injuries arose out of "the operation of an emergency vehicle, *while being driven in accordance with the requirements of Section 41–6–14.*" *Id.* § 63–30–10(15) (emphasis added). At the time of the accident, section 41–6–14 provided in pertinent part: "The operator of an authorized vehicle may ... *proceed past a red or stop signal* or stop sign, *but only after slowing down as may be necessary for safe operation* ...." *Id.* § 41–6–14(2)(b) (1988) (emphasis added). Chief Burton, therefore, had the privilege of running the red light only if he slowed down as necessary for safe operation. This plainly presented a factual question for the jury.

### B. Defendant's Motion for Judgment Notwithstanding the Verdict

¶ 21 The District's motion for a j.n.o.v. raised the question of whether the evidence supported the jury verdict which implicitly found that Chief Burton did not qualify for the privilege of proceeding through a red light. Regarding plaintiffs' theories of negligence, the trial court instructed the jury as follows:

In this case the plaintiffs claim the defendants were negligent in the following respects:

1. Glen Burton failed to yield the right of way at the intersection;

2. He entered the intersection at an unreasonably high speed under the circumstances;

3. He failed to keep a proper lookout;

4. He entered into the intersection against a red light in a vehicle that was not properly or adequately equipped to be an emergency vehicle.

To return a verdict for the plaintiffs, you must find by a preponderance of the evidence that:

i. The defendants were negligent in one or more of the particulars alleged by the plaintiffs; and

ii. The defendants' negligence was a proximate cause of the plaintiffs' injuries.

Concerning plaintiffs' second theory of negligence, the court instructed the jury that "[t]he operator of an authorized emergency vehicle, when responding to a fire alarm, may exercise privileges such as ... proceed[ing] past a red or stop signal or stop sign, but only after slowing down as necessary for safe operation." To aid the jury in its resolution of plaintiffs' fourth theory of negligence, the trial court gave the jury a detailed instruction on the statutory requirements contained in sections 41–6–132 and 41–6–146 concerning how authorized emergency vehicles must be equipped.

¶ 22 The jury found that Chief Burton was negligent in causing the accident; however, the jury did not make separate findings as to each of plaintiffs' theories of negligence. When "the jury does not identify which theory or theories it relied on in reaching its verdict, we may affirm the verdict if the jury could have properly found for the prevailing party on any one of the theories presented." *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 467 (Utah 1996) (citing *Cambelt Int'l Corp. v. Dalton*, 745 P.2d 1239, 1241–42 (Utah 1987) (additional citation omitted)). Thus, the general verdict finding Chief Burton negligent created a presumption that the jury found in favor of all of plaintiffs' theories of negligence. *See Turnbull v. Byram*, 235 Kan. 891, 684 P.2d 429,

---

5. The conclusion that subsection (15) governs this case is also mandated by our duty to avoid interpreting a statute in a manner that renders portions of the statute, or related statutes, meaningless. *See Schurtz*, 814 P.2d at 1112; *Olympia Sales Co. v. Long*, 604 P.2d 919, 921 (Utah 1979). If subsection (18)(b) applied here, the reference to responding to fire alarms in section 41–6–14 would not have any meaning in the context of subsection (15). Every time employees of a governmental entity drove to a fire in response to a fire alarm, subsection (18)(b) would be the governing exception, and there would be no need to look to the more specific exception for emergency vehicle operation found in subsection (15). This would render meaningless the reference to responding to fire alarms in section 41–6–14.

433 (1984); *Grumman Credit Corp. v. Rivair Flying Serv., Inc.*, 845 P.2d 182, 185 (Okla. 1992). Even if the evidence supports only one theory of negligence, that is sufficient to sustain the verdict.

¶ 23 The next question is whether there was evidence sufficient to support at least one of plaintiffs' theories of negligence submitted to the jury. On this issue, we "view[ ] the evidence in the light most favorable to the prevailing party." *Crookston*, 817 P.2d at 799. One possible factual basis for the jury's finding of negligence is that Chief Burton was driving too fast as he entered the intersection and therefore did not qualify for the exemption in subsection (15). Chief Burton gave conflicting testimony as to his speed as he entered the intersection, i.e., from ten to forty miles per hour. Because the jury was entitled to pick the higher figure, there was sufficient evidence to support a finding that he failed to comply with the requirement in subsection 41–6–14(2)(b) that he slow down "as may be necessary for safe operation" and was therefore negligent. The trial court properly denied the motion for a j.n.o.v.

¶ 24 We affirm the trial court's denial of defendants' motion for a j.n.o.v.

### III. CONSTITUTIONALITY OF SECTIONS 63–30–4 AND 63–30–34

¶ 25 Based on Utah Code Ann. § 63–30–4(4), the trial court dismissed plaintiffs' negligence actions against Chief Burton, and based on Utah Code Ann. § 63–30–34, that court cut the damages the jury awarded plaintiffs and entered judgment against the District for the statutory limit of $250,000 for each plaintiff. Thus, plaintiffs were denied any remedy for their personal injuries against Chief Burton and given only a partial remedy against the District. The reason for plaintiffs' appeals, therefore, is that they have been denied the full amount of damages the jury awarded them for the severe injuries they suffered. They argue that (1) the abrogation of their remedy for damages against Chief Burton as an individual and (2) the limitation on the amount of damages awarded against the District are unconstitutional. Specifically, plaintiffs contend that Utah Code Ann. § 63–30–34, which sets a cap on damage awards against government agencies,[6] is unconstitutional under Article I, section 11, the open courts provision, and Article I, section 24, the uniform operation of the laws provision. Plaintiffs also contend that Utah Code Ann. § 63–30–4(4), which bars all actions for injuries inflicted by government employees in their individual capacities by way of negligence, gross negligence, and recklessness,[7] is unconstitutional under the same two provisions.

¶ 26 A just and peaceful society must secure by law the fundamental rights of all its citizens. Among the basic rights protected by the Utah Declaration of Rights are the

---

6. Section 63–30–34 states:

(1) (a) Except as provided in Subsection (2), if a judgment for damages for personal injury against a governmental entity, or an employee whom a governmental entity has a duty to indemnify, exceeds $250,000 for one person in any one occurrence, or $500,000 for two or more persons in any one occurrence, the court shall reduce the judgment to that amount.

(b) A court may not award judgment of more than $250,000 for injury or death to one person regardless of whether or not the function giving rise to the injury is characterized as governmental.

(c) Except as provided in Subsection (2), if a judgment for property damage against a governmental entity, or an employee whom a governmental entity has a duty to indemnify, exceeds $100,000 in any one occurrence, the court shall reduce the judgment to that amount, regardless of whether or not the function giving rise to the damage is characterized as governmental.

(2) The damage limits established in this section do not apply to damages awarded as compensation when a governmental entity has taken or damaged private property for public use without just compensation.

7. Section 63–30–4(4) states:

An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee may be held personally liable for acts or omissions occurring during the performance of the employee's duties, within the scope of employment, or under color of authority, unless it is established that the employee acted or failed to act due to fraud or malice.

right to be free from physical harm inflicted by others, the right to acquire and own property, and the right of people to be free from injury to their reputations. The civil and criminal laws protect those interests in different ways. Criminal law sanctions are primarily designed to protect society at large. Those sanctions do not restore to a person wronged by another the losses inflicted on one's person or property. Imprisonment protects against further violations, and criminal fines inure to the benefit of the state, not the victim. Criminal law remedies do nothing to provide restorative or compensatory justice to persons wronged by others; that objective is left to the civil law to accomplish. Thus, while the criminal and civil law are separate bodies of law, they are also complementary components of a system of justice designed to safeguard the peace and safety of society. Ordinarily, restorative justice can be accomplished, even if only approximately, by money compensation for losses inflicted on one's person, property, or reputation.

¶ 27 Unless the law allows a person the right to vindicate in a court of law injuries to his person, property, and good name and status in the community, resort to self-help will inevitably occur and result in violence. Thus, the right to restorative or compensatory justice is indispensable to the security of the individual and the security of society itself. Under the Utah Constitution, that right is protected from arbitrary and unreasonably discriminatory laws.

¶ 28 Prior opinions of this Court have recounted the long Anglo–American history of the principles protected by Article I, section 11 of the Utah Declaration of Rights. The right of access to the courts and to a civil remedy to redress injuries, which Article I, section 11 protects, is fundamental in Anglo–American law. *See Craftsman Builder's Supply v. Butler Mfg.*, 1999 UT 18, ¶¶ 32–54, 974 P.2d 1194 (Stewart, J., concurring); *see also Berry v. Beech Aircraft*, 717 P.2d 670 (Utah 1985). The importance of these rights and their roots in English law were examined by Lord Coke and Sir William Blackstone centuries ago. The principle that a person is entitled to access to the courts for a civil remedy is not only the basis of an individual

right, but is also a keystone of the independence of the judiciary as a co-equal branch of government. *See Craftsman*, 1999 UT 18 at ¶¶ 32–54, 974 P.2d at 1203–10 (Stewart, J., concurring).

¶ 29 Indeed, that right is of increasing importance in the modern world. Politically powerful special interest groups pursuing their self-interests have from time to time sought to commandeer the law to advance their self-interests at the expense of a citizen's right to restorative justice by abrogating remedies essential to the protection of persons, property, and reputation. *See id.* The need to protect the right of access to the courts led the framers of the Utah and some thirty-eight other state constitutions to adopt open courts provisions, which had their origins in England and in this country in the constitutions of the first thirteen states. *See id.*

¶ 30 The legislative impetus to abrogate those rights has occurred from time to time because of majoritarian indifference and even hostility to the plight of those whose fundamental rights are harmed and whose only recourse is a judicial remedy. By and large, persons who suffer serious personal or property injuries are an isolated and unidentifiable minority who have little influence on legislative actions. These considerations were instrumental in the adoption of open courts clauses in a number of state constitutions. *See id.* As Justice Zimmerman trenchantly observed in his concurring opinion in *Condemarin v. University Hospital*, 775 P.2d 348, 367 (Utah 1989):

The constitution's drafters understood that the normal political processes would not always protect the common law rights of all citizens to obtain remedies for injuries. *See Berry*, 717 P.2d at 676; *cf. Developments in the Law: The Interpretation of State Constitutional Rights*, 95 Harv. L.Rev. 1324, 1498–1502 (1982) (protection of majority from politically powerful minorities as an approach to state constitutional interpretation); Note, *State Economic Substantive Due Process: A Proposed Approach*, 88 Yale L.J. 1487, 1498 (1979) (perfunctory judicial review is inadequate to protect against special interest legislation). At any one time, only

a small percentage of the citizenry will have recently been harmed and therefore will need to obtain a remedy from the members of any particular defendant class. The vast majority of the populace will have no interest in opposing legislative efforts to protect such a defendant class because the majority will not readily identify with those few persons unlucky enough to have been harmed. And those few persons directly affected will, in all likelihood, lack the political power to prevent the passage of legislation that, in essence, requires every member of the citizenry who is injured by members of the defendant class to bear some or all of the cost of those injuries.

*Id.* at 367.

¶ 31 In a somewhat similar vein, in a concurring opinion in *Craftsman*, Justice Stewart wrote:

The Framers of the Utah Constitution included Article I, section 11 to anchor in the Constitution rights that originated in the English Magna Carta of 1215 and that are among those essential to a peaceful society. The purpose of those rights is to bar sovereign power, whether kingly, parliamentary, or legislative, from undermining an independent judiciary and arbitrarily abolishing remedies that protect the person, property, or reputation of each individual.

*Craftsman*, 1999 UT 18 at ¶ 41, 974 P.2d 1194 (Stewart, J., concurring).

### A. Constitutionality of Cap on Damages of Weber Fire District

¶ 32 This Court has addressed the constitutionality of statutory limits or caps on compensatory damages in three cases. *See Bott v. DeLand*, 922 P.2d 732 (Utah 1996); *McCorvey v. State Dep't of Transp.*, 868 P.2d 41 (Utah 1993); *Condemarin v. University Hosp.*, 775 P.2d 348 (Utah 1989). Two cases have held the damage cap in Utah Code Ann. § 63–30–34 unconstitutional as applied. In

*Bott*, a unanimous court held that provision unconstitutional insofar as it limited one's right under Article I, section 9 to a remedy for violation of the right to be free from unnecessary abuse.

¶ 33 Plaintiffs argue that the cap on damages as applied to the District is unconstitutional under *Condemarin*. *Condemarin* held unconstitutional under Article I, sections 11 and 24, a cap on damages awarded against the University of Utah Hospital, a government agency that the Court held performed a "proprietary" or "nonessential governmental" function of providing medical services. Plaintiffs in this case contend that fire fighting activities are not essential governmental activities under the standards stated in *DeBry v. Noble*, 889 P.2d 428 (Utah 1995), and that the cap is therefore unconstitutional under *Condemarin*.

¶ 34 In response, the District argues that fire fighting is an "essential governmental function" and that *McCorvey* controls. *McCorvey* held constitutional a cap on damages against a governmental agency performing the "essential governmental" function of highway design and maintenance.

¶ 35 Thus, whether *Condemarin* or *McCorvey* governs the constitutionality of the damage cap depends on the nature of the services performed, the government agency, and the effect of liability in rendering those services. *See DeBry*, 889 P.2d 428. *DeBry* held that the legal principles the Legislature established in the landmark Governmental Immunity Act of 1965, as construed in *Standiford v. Salt Lake City Corp.*, 605 P.2d 1230 (Utah 1980), reflected the proper constitutional boundary between those governmental activities that are entitled to immunity under governmental immunity law (subject to legislative waiver) and are not subject to Article I, section 11 protections, and those governmental activities that are not subject to immunity and that are subject to the remedies protected by Article I, section 11.[8] *See DeBry*, 889 P.2d at 440.

---

8. The 1965 Act abolished the prior distinction made by the case law between state immunity and municipal immunity, a development that was started by cases decided by this Court prior to enactment of the Act. In addition, the Act

provided for governmental liability for the negligent conduct of governmental employees, whether state, county, or municipal, with some exceptions.

¶ 36 Prior to the enactment of the Governmental Immunity Act of 1965, governmental immunity law in this state was entirely a product of judge-made case law. Under that case law, governmental activities deemed to be proprietary were not immune and governmental activities deemed to be "governmental" as opposed to proprietary were immune. *See Standiford*, 605 P.2d at 1231–35. The Governmental Immunity Act of 1965, 1965 Utah Laws 290 ch. 139, sought to rationalize the conflicting and chaotic case law that had developed under the governmental/proprietary test and other similar tests that the courts had applied. *See DeBry*, 889 P.2d at 432–40. To that end, the Act enunciated basic principles to be applied in deciding what governmental activities were immune and what were not. As originally enacted, the 1965 Act did not address the common law doctrine of official immunity. Thus, the liability of government employees for their torts, remained wholly intact. This official immunity law was also almost wholly judge-made.

¶ 37 In this state, the governmental/proprietary test, which gave rise to highly confused legal analysis and inconsistent results, is no longer determinative of whether a governmental agency is entitled to governmental immunity. *See DeBry*, 889 P.2d 428; *Madsen v. Borthick*, 658 P.2d 627 (Utah 1983); *Thomas v. Clearfield*, 642 P.2d 737 (Utah 1982); *Johnson v. Salt Lake City*, 629 P.2d 432 (Utah 1981); *Standiford*, 605 P.2d 1230. The same is true in most other states. *See* Charles S. Rhyne, *The Law of Local Government Operations* 1142–44 (1980).[9]

¶ 38 *Standiford*, 605 P.2d 1230, was the first case to adumbrate the scope of governmental immunity as established by the principles enunciated in the 1965 Act. *Standiford* noted the inconsistent and chaotic status of governmental immunity case law as it existed prior to the Governmental Immunity Act of 1965. *Standiford* provided a new basis for distinguishing between governmental activi-

ties that were immune and those that were not. *See DeBry*, 889 P.2d at 436–42.

¶ 39 Following *Standiford, DeBry* for the first time addressed the inherent tension between Article I, section 11 rights and governmental immunity. In *DeBry*, this Court stated:

> [P]olicies favoring governmental immunity cannot be viewed in isolation from article I, section 11 and the harsh effect of denying individuals a remedy for what may be devastating injuries. In applying the *Standiford* test, the Court must, among other things, evaluate whether the effect of tort liability would promote public safety or defeat essential or core governmental activities and programs that are critical to the protection of public safety and welfare.

*DeBry*, 889 P.2d at 440 (citations and footnotes omitted).

¶ 40 *Rollow v. Ogden City*, 66 Utah 475, 243 P. 791 (Utah 1926), held that fire fighting activities were "governmental" activities under the common law governmental/proprietary test and therefore immune from tort liability. Plaintiffs contend that under the test set out in *DeBry* fire fighting is not an essential governmental function entitled to immunity because fire protection can be and sometimes is offered by private organizations. However, *DeBry* rejected the proposition that just because an activity that is performed by government may be, or sometimes is, performed privately, that activity is therefore a nonessential governmental activity and not entitled to immunity. *See DeBry*, 889 P.2d at 441–42. Fire fighting, as well as most governmental activities, can be and sometimes is done by private organizations. Whether a particular function may be performed by nongovernmental entities is only one factor to be considered in determining whether that function is a governmental function and therefore immune. *See id.; see*

---

9. From the earliest days of state constitutions—even before the adoption of the United States Constitution—inherent tension was observed between the doctrine of sovereign immunity and state constitutional rights of persons to civil law remedies for injuries to their persons and proper-

ties. For example, the Pennsylvania constitution provided an open courts remedies provision that also referred to sovereign immunity. *See Craftsman*, 1999 UT 18 at ¶ 46, 974 P.2d 1194 (Stewart, J., concurring).

*also Madsen,* 658 P.2d 627; *Thomas,* 642 P.2d 737.[10]

¶ 41 There are compelling reasons why fire fighting activities historically have been, and should be, deemed an essential governmental activity. Fire fighting is essential to the safety of persons and property in a community. Those engaged in fire fighting activities, in discharging their necessary duties, undertake the highly hazardous activities necessary for the protection of persons and property. Fire fighting requires instantaneous decisions by persons in highly hazardous circumstances that involve the safety of firefighters themselves and the security of the community, or large parts of it. Imposing the potential for legal liability for injuries occurring to persons and property is incompatible with the inherent risks of fire fighting. After-the-fact judicial decisions assessing the propriety of a firefighter's decision could seriously impede effective fire fighting by promoting the value of caution over that of prompt action. Indeed, tort actions for injuries to persons or property based on untoward results in fire fighting could result in an "overall loss in safety, rather than greater safety and protection," even more so than is the case with respect to the enforcement of building regulations. *See DeBry,* 889 P.2d at 441.

¶ 42 For these reasons, the law holds that the security of the community as a whole as well as the security of individuals is more safe and secure with tort immunity for fire fighting than without it. In short, we hold, consistent with the law as it existed prior to the enactment of the Act and consistent with sound policy, that fire fighting activities are an essential and core governmental activity.[11]

¶ 43 It follows that fire fighting activities are core governmental activities under *De-*

---

10. Almost all, if not all, governmental functions can be performed by nongovernmental entities. The more an activity is revenue producing and especially profit making, the more likely this factor weighs in favor of its being nongovernmental.

11. We recognize that the Legislature in a 1983 amendment to the Governmental Immunity Act labeled all governmental activities as essential,

*Bry,* and are immune from tort remedies, except insofar as the Legislature has waived that immunity, as it has with respect to the operation of emergency vehicles, such as fire fighting vehicles, while driven on public highways. It also follows that the limitation of the District's damages under Utah Code Ann. § 63–30–34 is constitutional under Article I, section 11 as construed in *McCorvey,* 868 P.2d 41.

### B. The Historic Liability of Government Employees for Wrongs They Commit in the Course of Their Employment

¶ 44 We turn now to the separate and distinct issue of Chief Burton's liability in his personal capacity. Utah Code Ann. § 63–30–4 abrogates all actions against government employees for injuries they cause to others in their person and property, unless the employee acts with fraud or malice. The immunity given government employees by the 1978 and 1982 amendments to the Act created a sharp break with the Act as it existed prior thereto and, more importantly, with prior law holding such employees liable for their civil wrongs. The law in Utah, as in most other states, had been that government employees, like all business employees and all other persons, were personally liable for civil wrongs that injured the persons or property of others.

> [T]he common law traditionally did not distinguish between public officials and private individuals for purposes of determining the scope of personal tort liability. In fact, courts that drew such a distinction often imposed a stricter standard of care on officials than on private individuals, holding them personally liable for the consequences of simple, non-negligent mistakes.

George A. Bermann, *Integrating Governmental and Officer Tort Liability,* 77 Colum.

---

core activities entitled to immunity unless the Legislature waives immunity. But governmental immunity is subject to the Constitution and whatever limitations it imposes on such immunity. *See DeBry,* 889 P.2d 428; *Condemarin,* 775 P.2d 348. It follows that the scope of the constitutional limitations is a judicial question under the doctrine of separation of powers. *See DeBry,* 889 P.2d at 440.

L.Rev. 1175, 1178 (1977). Thus, government employees could be sued in their individual capacity for wrongful acts committed in the course of their employment, even when governmental immunity barred a suit against the government agency itself. Nevertheless, the law recognized an important exception to that general rule. If the liability of employees or agents could unduly and adversely affect governmental operations by making discretionary decisions subject to suit, no liability would attach. It has long been the law that government agents are not liable for injuries to persons or property that arise from the implementation of *governmental* discretion.[12] As Professor Bermann stated, the purpose of this qualified *official immunity* is to avoid making "public officials unduly fearful in their exercise of [discretionary] authority and discourag[ing] them from taking prompt and decisive action." Bermann, *supra*, at 1178. Officials exercising judicial, quasi-judicial, or legislative functions have broad immunity under somewhat different rules. *See Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (judicial immunity); *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (legislative immunity). Accordingly, suits against government employees were limited to non-policy-making, nondiscretionary acts.

¶ 45    As in most jurisdictions, government employees in this state were personally liable for civil wrongs committed in a ministerial or operational capacity. *See Frank v. State*, 613 P.2d 517 (Utah 1980) (state-employed health care provider held subject to tort duty of due care in rendering medical treatment); *Benally v. Robinson*, 14 Utah 2d 6, 376 P.2d 388 (1962) (police officer held liable for failing to exercise due care for safety of prisoner); *Jensen v. Taylor*, 2 Utah 2d 196, 271 P.2d 838 (1954) (driver of fire truck held liable for negligent operation of fire truck); *Bowman v. Hayward*, 1 Utah 2d 131, 262 P.2d 957 (Utah 1953) (police officer held liable for assault and battery on a prisoner); *Richard-*

*son v. Capwell*, 63 Utah 616, 176 P. 205 (1918) (jailer held subject to duty of due care for failing to provide prisoner with food, warmth, and proper sanitary conditions); *Clinton v. Nelson*, 2 Utah 284 (1877) (marshal held subject to damages for tortuous mistreatment of prisoner); *see also Payne v. Myers*, 743 P.2d 186 (Utah 1987).

¶ 46    A government agent or employee performing a ministerial function could be liable even if the agency itself was engaged in a governmental function and was immune from suit. For example, in *Connell v. Tooele City*, 572 P.2d 697 (Utah 1977), a court clerk was held liable for failing to docket the payment of a fine, a ministerial duty, even though the court itself was engaged in a governmental function. *See also Cornwall v. Larsen*, 571 P.2d 925 (Utah 1977); *Benally*, 14 Utah 2d 6, 376 P.2d 388; *Jensen*, 2 Utah 2d 196, 271 P.2d 838; *Bowman*, 1 Utah 2d 131, 262 P.2d 957; *Geros v. Harries*, 65 Utah 227, 236 P. 220 (1925).[13]

¶ 47    In keeping with these principles, prior to enactment of section 63-30-4 in its present form, a government employee who exercised governmental discretion in good faith was not personally liable for resulting civil wrongs. *See Ross v. Schackel*, 920 P.2d 1159 (Utah 1996) (prison employee exercising what Court held to be governmental discretion held not liable); *Sheffield v. Turner*, 21 Utah 2d 314, 445 P.2d 367 (1968) (same); *Hjorth v. Whittenburg*, 121 Utah 324, 241 P.2d 907 (1952) (state road commissioner exercising discretionary powers held not liable for damages to property adjacent to highway); *Garff v. Smith*, 31 Utah 102, 86 P. 772 (1906) (official exercising what the common law deemed to be "quasi-judicial" authority held not liable).

¶ 48    Under these long-established principles, Chief Burton would be personally liable to plaintiffs for his negligent driving. *Jensen*, 2 Utah 2d 196, 271 P.2d 838, is squarely on point. *Jensen* suggests that the operation

---

**12.**    This immunity is characterized as "qualified," not absolute, because actions taken in bad faith or with malice are not immune.

**13.**    In the instant case, the Legislature in effect specified the standard of legal care required by the operators of emergency vehicles. This stan-

dard is necessarily somewhat different from the standard of reasonable care that is required of all persons generally. This modification of the standard of care for emergency vehicles raises no substantial constitutional issues.

of an emergency vehicle such as a fire engine does not involve the exercise of governmental discretion. On facts much like the instant case, *Jensen* held the driver of a city fire engine personally liable for negligently causing injuries to a passenger in a car hit by the fire engine, even though the city was immune from suit. *Cornwall*, 571 P.2d 925, held to the same effect with respect to a deputy sheriff's negligent driving while responding to an emergency situation. For similar cases, see also *Day v. State*, 980 P.2d 1171 (Utah 1999); *Benally*, 14 Utah 2d 6, 376 P.2d 388; *Bowman*, 1 Utah 2d 131, 262 P.2d 957. *Compare Jensen*, 2 Utah 2d 196, 271 P.2d 838, *with Rollow*, 66 Utah 475, 243 P. 791. This is also the general rule in a number of other jurisdictions with respect to the driving of fire engines. *See, e.g., Indianapolis Traction & Terminal Co. v. Howard*, 190 Ind. 97, 128 N.E. 35 (1920); *Russell v. Nadeau*, 139 Me. 286, 29 A.2d 916 (1943); *Garrity v. Detroit Citizens' Street Ry. Co.*, 112 Mich. 369, 70 N.W. 1018 (1897); *Frandeka v. St. Louis Public Serv. Co.*, 361 Mo. 245, 234 S.W.2d 540 (1950); *Johnson v. Brown*, 75 Nev. 437, 345 P.2d 754 (1959); *Woods v. Public Serv. Co.*, 84 N.J.L. 171, 85 A. 1016 (1913); *Siburg v. Johnson*, 249 Or. 556, 439 P.2d 865 (1968); *Ferraro v. Earle*, 105 Vt. 243, 164 A. 886 (1933); *Davis v. Cross*, 152 W.Va. 540, 164 S.E.2d 899 (1968); *see also Ruth v. Rhodes*, 66 Ariz. 129, 185 P.2d 304, 309 (1947) (highway patrolman).

¶ 49 In sum, in Utah, as elsewhere, the law provided a "remedy by due course of law" for personal injuries caused by the negligent operation of an emergency vehicle, although the standard of negligence has been modified to free such vehicles from compliance with certain traffic regulations. Under that law generally, and specifically under *Jensen* and *Cornwall*, which held drivers of emergency vehicles liable for the manner in which they drove, Chief Burton would be liable personally for the injuries he caused plaintiffs and plaintiffs would have had a remedy under the law as it existed prior to the 1982 amendment to Utah Code Ann. § 63–30–4.

¶ 50 The Governmental Immunity Act as initially enacted in 1965 did not affect the law of government employee liability in any way; indeed, it recognized and accepted it. *See* 1965 Utah Laws ch. 139. The Act specifically authorized governmental agencies to purchase insurance to indemnify employees for judgments against them for injuries they inflicted on the person and property of others. Section 33 of chapter 139, 1965 Laws of Utah, provided:

> A governmental entity may insure any or all of its employees against all or any part of his liability for injury or damage resulting from a negligent act or omission in the scope of his employment regardless of whether or not said entity is immune from suit for said act or omission, and any expenditure for such insurance is herewith declared to be for a public purpose.

Thus, the Governmental Immunity Act of 1965 did not in any way affect government employees' liability for civil wrongs, but the Act did provide that government agencies could insure their employees against personal liability. *Cornwall*, 571 P.2d 925, described the state of the law after the Governmental Immunity Act was enacted in 1965:

> The Utah Governmental Immunity Act applies only to entities and does not include individuals (employees) and such was noted by the court in *Sheffield v. Turner*, ... and the Act contains no language exempting employees from suit.... [L]egislative intent is clearly expressed in that portion of the Act which allows the entity to *insure* its employees against liability for their negligent acts.

*Cornwall*, 571 P.2d at 927 (footnotes omitted). In light of the law stated above, plaintiffs would have had a remedy for their injuries prior to enactment of section 63–30–4 in its present form.

### C. Constitutionality of Abrogation of Remedies Against Government Employees

¶ 51 We turn now to the constitutionality of Utah Code Ann. § 63–30–4 under Article I, section 11. In 1978 and 1982, section 63–30–4 was amended to bar all actions against government employees for fault-based conduct except for fraud and malice.

¶ 52  Whether the abrogation of those remedies violates Article I, section 11 depends on the application of the two standards enunciated in *Berry v. Beech Aircraft*, 717 P.2d 670 (Utah 1985):

> First, section 11 is satisfied if the law provides an injured person an effective and reasonable alternative remedy "by due course of law" for vindication of his constitutional interest. The benefit provided by the substitute must be substantially equal in value or other benefit to the remedy abrogated in providing essentially comparable substantive protection to one's person, property, or reputation, although the form of the substitute remedy may be different. . . .
>
> Second, if there is no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective.

*Id.* at 680 (citations omitted); *see also Craftsman*, 1999 UT 18, 974 P.2d 1194; *Hirpa v. IHC Hospitals*, 948 P.2d 785 (Utah 1997).

*1.  Is there an equal alternative remedy to the abrogated remedy against Chief Burton?*

¶ 53  It stands to reason that under the first standard an abrogation of remedies is constitutional if there is "an effective and reasonable alternative remedy" that is "substantially equal in value or other benefit to the remedy abrogated." *Berry*, 717 P.2d at 680.  To the extent that a person's damages are *less* than the damage limitation of $250,000 imposed by section 63–30–34, the remedy against the governmental agency, as a substitute for a remedy against government employees, is constitutional because it is in all respects a remedy of equivalent value to the remedy against the employee.  However, to the extent the damages awarded by a court exceed the statutory limitation, as in this case, the substitute remedy is by definition not equal to the remedy abrogated.  Thus, the specific issue we now address is whether the damage limitation is constitutional when it limits recovery in an action that is a substitute for an action against a government employee.

¶ 54  In this case, plaintiffs have an alternative to the remedy against Chief Burton in the form of an action against the District.  That remedy, however, unlike the traditional remedy against the employee is subject to the damage limitation and, therefore, is not "substantially equal" to the preexisting remedy against the employee.

*2.  Is abrogation justified by a clear social or economic evil and is abrogation arbitrary?*

¶ 55  However, the conclusion reached above that the limited remedy against the government agency is not an equal substitute for the remedy against the government employees does not necessarily mean that the abrogation is unconstitutional.[14]  The second part of the *Berry* test holds that if there is no substitute or alternative remedy of substantially equal value, the abrogation may nevertheless be constitutional "if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary and unreasonable means for achieving the objective." *Berry*, 717 P.2d at 680.  In *Craftsman*, 1999 UT 18, 974 P.2d 1194, we recently held constitutional a builder's statute of repose because the abrogation of a remedy by a statute of repose had a de minimus effect on the plaintiffs' actions against the builders and the statute of repose was justified by undue economic and other burdens.  In a like vein, *Hirpa*, 948 P.2d 785, held constitutional the Good Samaritan Act, which immunized from personal injury actions doctors who provided professional care in emergencies to persons who were not their patients.  In effect, the Court held that the abrogation of a remedy was justified by the

---

14.  *Sun Valley Water Beds, Inc. v. Herm Hughes & Son, Inc.*, 782 P.2d 188 (Utah 1989), held that a claim for the same or similar damages against a different defendant was not an "alternative remedy" for Article I, section 11 purposes.  That rule does not control here because the liability of an agency is predicated on the liability of the employee.  If the relationship is not one of respondeat superior, it is certainly similar.

greater protection that injured persons would receive from doctors.

¶ 56 Defendants do not assert that the abrogation in this case is necessitated by some economic, social, or other evil. Defendants assert no factual or policy justification for the abrogation of remedies against government employees other than the saving of money. Indeed, *Condemarin* has already held that reducing the cost to government of assuming liability for certain types of liability was not a sufficient justification for requiring the most seriously injured persons to assume the whole of that cost. *See Condemarin,* 775 P.2d 348.

¶ 57 The Legislature has already provided the means for government agencies to protect their employees from the cost of liability. All government entities are authorized to insure their "employees against liability, in whole or in part, for injury or damage resulting from an act or omission occurring during the performance of an employee's duties ... regardless of whether ... that entity is immune from suit for that act or omission." Utah Code Ann. § 63–30–33(1)(a). And the insurer has no right of indemnification or contribution from either the government entity or the employee. *See id.* § 63–30–33(1)(c).

¶ 58 Furthermore, government employees are protected by the statutory right to have legal representation provided and by the right to indemnification from an agency if the employee is liable for an act occurring "during the performance of the employee's duties." Utah Code Ann. § 63–30–36(1). Thus, an employee is protected from financial loss as the law now stands. And the government agency itself can also be protected by insurance. In short, government agencies can spread the risk of loss in the same manner as private agencies can.

¶ 59 Defendants do not argue that there would be an undue financial burden on the government if government employees are held personally liable for torts committed on public highways. To the extent that the government experiences any financial burden from employee liability, it is only because the Legislature indemnifies employees for damages they incur in the course of their employ-

ment. But that is a burden that the Legislature voluntarily assumes; it has no legal obligation to do so. *See Forseth v. Sweet,* 38 Wis.2d 676, 158 N.W.2d 370 (1968); Phillip E. Hassman, Annotation, *Indemnification of Public Officer or Employee,* 71 A.L.R.3d 90 (1976).

¶ 60 Nor can the abrogation be justified on the ground that employee liability impedes or interferes with the performance of governmental responsibilities. Defendants do not so contend. Indeed, the common law barred actions against governmental officials when governmental operations would be impeded. That, indeed, is the policy underlying legislative and judicial immunity and the exception to liability for administrative and executive employees when exercising governmental discretion. *See generally Bott,* 922 P.2d 732. Nor do defendants contend that the abrogation of remedies is necessary to protect the public treasury from insolvency or unduly burdensome tax burdens, or that enforcement and implementation of government programs or policies would be jeopardized. Indeed, the existence of civil remedies against government employees for damage they cause by their wrongful conduct in almost all American jurisdictions strongly evidences the absence of a compelling justification for an across-the-board abrogation of remedies against government employees.

¶ 61 Furthermore, the cap operates in a capricious and insidiously discriminatory fashion. First, the cap insidiously discriminates by allowing those who are not seriously injured to recover full damages but denies full recovery to those who are most seriously injured and whose damages exceed the cap. Those who are most seriously injured must therefore bear the greatest burden in reducing government costs. The result is a vicious policy: those who most need a full remedy to deal with the devastation wreaked on their lives and families because of the severity of the injuries inflicted are denied that recovery and shoulder the entire burden of protecting the government's treasury, while those whose injuries are less life altering receive full compensation for their injuries and shoulder no burden at all. Thus, the cap

imposes on the few persons who are most seriously injured and impaired the cost of reducing governmental expenses. Chief Justice Bird of the California Supreme Court in addressing the constitutionality of a damage cap observed:

[T]he $250,000 limit . . . is *grossly* underinclusive by any standard. Millions of healthcare consumers [i.e., taxpayers] stand to gain from whatever savings the limit produces. Yet, the entire burden of paying for this benefit is concentrated on a handful of badly injured victims—fewer than 15 in the year MICRA was enacted. Although the Legislature normally enjoys wide latitude in distributing the burdens of personal injuries, the singling out of such a minuscule and vulnerable group violates even the most undemanding standard of underinclusiveness.

*Fein v. Permanente Med. Group*, 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665, 692 (Bird, C.J., dissenting), *quoted in Condemarin*, 775 P.2d at 355.

¶ 62   It was in part this kind of invidious discrimination that was the basis of the holding in *Pfost v. State*, 219 Mont. 206, 713 P.2d 495 (1985), which held unconstitutional a damage cap on actions against the state. A number of other courts have also held damage caps unconstitutional, albeit in statutes dealing with medical malpractice. *See, e.g., Waggoner v. Gibson*, 647 F.Supp. 1102, 1107 (N.D.Tex.1986); *Wright v. Central Du Page Hosp. Ass'n*, 63 Ill.2d 313, 347 N.E.2d 736, 743 (1976); *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 757 P.2d 251 (1988); *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825, 838 (1980) (state law capped amount insurance companies could pay to victims); *Arneson v. Olson*, 270 N.W.2d 125, 136 (N.D.1978); *Simon v. St. Elizabeth Med. Ctr.*, 355 N.E.2d 903, 906–07 (Ohio Misc.1976) (dictum); *Baptist Hosp. of Southeast Texas, Inc. v. Baber*, 672 S.W.2d 296, 298 (Tex.App. 1984); *see also Smith v. Department of Ins.*, 507 So.2d 1080 (Fla.1987); *Jones v. State Bd. of Medicine*, 97 Idaho 859, 555 P.2d 399, 416 (1976), *cert. denied*, 431 U.S. 914, 97 S.Ct.

2173, 53 L.Ed.2d 223 (1977) (remanding for factual determination on whether medical malpractice crisis actually existed); *Lucas v. United States*, 757 S.W.2d 687 (Tex.1988). *But see Johnson v. St. Vincent Hosp., Inc.*, 273 Ind. 374, 404 N.E.2d 585, 601 (1980) (upholding limitations where there is partial alternative remedy).

¶ 63   Defendants rely on *Masich v. United States Smelting, Refining & Mining Co.*, 113 Utah 101, 191 P.2d 612 (1948), for the proposition that the abrogation of a remedy against a government employee in this case is justifiable because the Legislature provided a limited alternative remedy against government agencies. We have held above that the alternative remedy is not a substantially equal remedy. *Masich* does not support an opposite position.[15]

¶ 64   The Legislature's concern for protecting the financial resources of the state, its subdivisions, and its municipalities is certainly justified. Those resources could be threatened by unexpected and unforeseeable events, and certainly the Legislature should take precautions to protect against events that might threaten those resources. Catastrophic events could have severe financial consequences for government if there were unlimited civil liability in such circumstances. The Congress of the United States recognized as much in enacting the Price Anderson Act of 1946, for example, which placed an overall cap on the total amount of damages that could be recovered as a result of a nuclear accident. *See Duke Power v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (sustaining constitutionality of Price Anderson Act, 42 U.S.C. §§ 8, 2210). However, this is an ordinary personal injury action filed against a government employee or entity for injuries caused by the negligent operation of vehicles on public highways, and the actions are common, everyday experiences. All drivers of vehicles are held personally liable for negligence on the highways. For many decades, the high cost of medical expenses, lost wages, and property damages

---

**15.** The District argues that the Legislature expanded governmental liability as a quid pro quo for eliminating employee liability for recklessness and negligence. This argument is historically incorrect. Defendants' attempt to fit this case into the mold of *Masich* is errant.

resulting from such accidents has been mitigated by spreading those costs to the motoring public by insurance and by the doctrine of respondeat superior. Certainly, government agencies are similar to business establishments that spread the cost of legal liability incurred by their employees over a wide base. The assumption of such costs is uncomfortable for an agency that must pay, but ordinarily it is no more so than in the world of private business where business entities are required to accept liability as a cost of business for the injuries that are caused by those who act for and on behalf of the entity and in pursuit of its goals.

¶ 65 We recognize that governmental budgets may be affected by such liability, and the burden of such liability may fall more heavily on smaller governmental agencies and municipalities than on larger entities because of smaller tax bases.[16] However, the Legislature has taken highly farsighted action to allow such agencies to deal with those problems.

¶ 66 The traditional rationale for sustaining damage caps, and indeed the concept of governmental immunity as such, is the potentiality of bankrupting a government agency. The Legislature has provided, however, a reasonable means to cope with the financial burden of potentially large judgments. First, punitive damages are barred outright. *See* Utah Code Ann. § 63–30–22(1)(a). Second, Utah Code Ann. § 63–30–26 provides that any political subdivision may create and maintain a reserve fund for the purpose of purchasing liability insurance to protect the subdivision from money judgments. Third, section 63–30–24 provides that the payment of any claim or judgment against a political subdivision may be made by installment payments if funds during the current fiscal year are not adequate to pay the amount due. These provisions clearly make it possible for government agencies to be responsible for the injuries their employees inflict on private citizens without imperiling governmental operations.

#### D. Response to Chief Justice Howe's and Justice Zimmerman's Opinions

¶ 67 Chief Justice Howe opines that section 63–30–34 does not violate section 11 of the Utah Declaration of Rights. He erroneously relies on *Payne v. Myers,* 743 P.2d 186 (Utah 1987), for the proposition that the damage cap is constitutional. *Payne* held generally that abrogation of a person's right to sue a state employee was constitutional because the injured person had a right to sue the state for the employee's negligence. *See Payne,* 743 P.2d at 190. *Payne* did not address at all—indeed the issue was not even before the Court—whether *a cap on the remedy* was constitutional as a full and fair substitute remedy for an action against a state employee. *See id.* at 186–90.

¶ 68 Chief Justice Howe wholly ignores the case law that requires a conclusion contrary to the one he reaches. He does not even cite *Condemarin v. University Hospital,* 775 P.2d 348 (Utah 1989), which held that the damage cap in section 63–30–34 was unconstitutional as applied and that an injured person has a right to full damages, except when sovereign immunity applies. Nor does he cite *Bott v. DeLand,* 922 P.2d 732, 744 (Utah 1996), which held an injured person entitled to full damages and the cap unconstitutional. *McCorvey v. State Department of Transportation,* 868 P.2d 41 (Utah 1993), does not support Chief Justice Howe's argument either. It held that because the state had waived immunity partially, the cap was constitutional because the state could have refused to waive immunity altogether. *McCorvey* did not deal with the constitutionality of the cap with respect to a substitute remedy for a claim not subject to sovereign immunity at all, as in the instant case.

¶ 69 Justice Zimmerman also ignores both *Bott* and *Condemarin,* a case in which he wrote a concurring opinion strongly supporting *Berry v. Beech Aircraft* and our Article I, section 11 jurisprudence. He wrote:

---

**16.** Although the purpose of sovereign immunity has been said to protect the public treasury from depletion, it is ironic that at common law the states enjoyed an absolute immunity, whereas actions against municipalities could be maintained in many instances, irrespective of the fact that municipalities' treasuries were considerably smaller than that of the state. *See DeBry,* 889 P.2d 428.

But there is no reason to consider that issue in great detail today because this case is properly analyzed under the due process balancing approach that *Berry* indicated is applicable when considering article I, section 11 questions.[1]

The present case has given me a better appreciation of the wisdom of including article I, section 11's guarantee in Utah's basic charter. The constitution's drafters understood that the normal political processes would not always protect the common law rights of all citizens to obtain remedies for injuries. *See Berry*, 717 P.2d at 676; *cf. Developments in the Law: The Interpretation of State Constitutional Rights*, 95 Harv. L.Rev. 1324, 1498–1502 (1982) (protection of majority from politically powerful minorities as an approach to state constitutional interpretation); Note, *State Economic Substantive Due Process: A Proposed Approach*, 88 Yale L.J. 1487, 1498 (1979) (perfunctory judicial review is inadequate to protect against special interest legislation). At any one time, only a small percentage of the citizenry will have recently been harmed and therefore will need to obtain a remedy from the members of any particular defendant class. The vast majority of the populace will have no interest in opposing legislative efforts to protect such a defendant class because the majority will not readily identify with those few persons unlucky enough to have been harmed. And those few persons directly affected will, in all likelihood, lack the political power to prevent the passage of legislation that, in essence, requires every member of the citizenry who is injured by members of the defendant class to bear some or all of the cost of those injuries.

Admittedly, the interests of a majority of the populace are commonly overridden in the legislative process, and, indeed, such overriding may be essential to the responsible operation of a representative deliberative body. However, the very act of drafting a constitution such as ours, which does not bestow unlimited power on the legislature and which does reserve certain rights to the people, constitutes a recognition that there must be some limits on the legislature, that some interests of the peo-

ple deserve special protection in the maelstrom of interest group politics that is the legislative process. Among the interests to which the Utah Constitution's drafters assigned a degree of sanctity are those mentioned in article I, section 11.

[1] I cannot agree with the Chief Justice [i.e., Gordon Hall] that due process-type balancing analysis is inappropriate here. Plaintiffs have certainly raised the article I, section 11 issue in this case by arguing that the legislation infringes rights protected by that provision. While plaintiffs may have phrased some portions of this argument in terms of equal protection concepts, we are certainly not limited to so analyzing the issue. *Berry* teaches that it is precisely due process concepts, rather than those of equal protection, that are involved when rights protected by article I, section 11 are claimed to have been abridged. 717 P.2d at 675–81. Therefore, it is appropriate for us to use due process analytical methods when treating such claims, whatever approach the parties may have taken to the issues.

*Condemarin*, 775 P.2d at 367–68.

¶ 70 Justice Zimmerman's current position in this matter is quite extraordinary. The fundamental issue he addresses was not raised, briefed, or argued in this Court. His opinion is a personal expression of a private opinion related to no issue properly before the Court. Indeed, in *Craftsman*, 1999 UT 18 at ¶ 108, 974 P.2d 1194, he argued the same point, although it was not raised, briefed, or argued. Because Justice Zimmerman's concurring opinion erroneously stated the law that has existed in Utah for over fifty years and has been concurred in by at least thirteen different justices, I responded in a lengthy concurring opinion rebutting his position point by point. *See id.* at ¶¶ 32–107, 974 P.2d 1194 (Stewart, J., concurring). The reader should refer to the concurring opinions in *Craftsman* for the full text of the arguments. *See id.* at ¶¶ 32–155, 974 P.2d 1174.

¶ 71 Until the last year or so, Justice Zimmerman was a foremost proponent of the due process-type test laid down in *Berry*, 717 P.2d 670, for construing Article I, section 11 jurisprudence. Indeed, he even went so far as to assert that statutes that abrogate remedies that are protected by Article I, section 11 should be presumed unconstitutional. *See Condemarin*, 775 P.2d at 368 (Zimmerman, J., concurring). No other member of this Court has ever gone that far. Yet now, he

asserts, as he did in *Craftsman*, that "the language of article I, section 11 ... should be read as a procedural guarantee and that we should largely retreat from second-guessing the legislature on the substantive matters that [had been] within [the] reach ... of *Berry*." Zimmerman op. at ¶ 90. The extraordinary attempt to rewrite the language in Article I, section 11 is fully discredited by the plain language of the provision itself, as pointed out in my opinion in *Craftsman*. *See Craftsman*, 1999 UT 18 at ¶¶ 56–63, 974 P.2d 1194 (Stewart, J., concurring). His position that *Berry* and its progeny have somehow constitutionalized the common law was likewise fully rebutted in that exchange. *See id.* at ¶¶ 32–34, 974 P.2d 1194.

¶ 72 Justice Zimmerman acknowledges that he carries a heavy burden under the doctrine of stare decisis in reversing his very own position. His assertion that he met that burden in his separate opinion in *Craftsman*, 1999 UT 18 at ¶¶ 108–155, 974 P.2d 1194 (Zimmerman, J., concurring in the result), is far wide of the mark. No one joined that position. My concurring opinion was joined by Associate Chief Justice Durham, and Justice Russon stated his agreement with that opinion in a footnote in his majority opinion. *See id.* at ¶ 15, 974 P.2d 1994. Moreover, thirteen justices of this Court have all taken the position that Article I, section 11 provides substantive rights to the citizens of Utah. Our case law to that effect extends over half a century, as I pointed out in *Craftsman*. Justice Zimmerman stands alone in the views he espouses.

## IV. PREJUDGMENT INTEREST

■ ¶ 73 Plaintiffs argue that the trial court erred by not awarding them prejudgment interest pursuant to Utah Code Ann.

§ 78–27–44.[17] "A trial court's decision to grant or deny prejudgment interest presents a question of law which we review for correctness." *Cornia v. Wilcox*, 898 P.2d 1379, 1387 (Utah 1995) (citations omitted).

¶ 74 The trial court denied plaintiffs' request for prejudgment interest on the basis that prejudgment interest is properly classified as "damages" under section 63–30–34 and is therefore subject to that section's cap, which plaintiffs had already reached. Since section 63–30–34 is unconstitutional, the trial court was incorrect to deny plaintiffs' claims for prejudgment interest on the grounds given. The decision of the trial court denying prejudgment interest is reversed with instructions to reconsider the issue of prejudgment interest on remand.

## V. COSTS

¶ 75 Plaintiffs claim that the trial court erred in refusing to award them costs under Rule 54 of the Utah Rules of Civil Procedure. Rule 54(d) provides:

(1) *To whom awarded.* Except when express provision therefor is made either in a statute of this state or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs; provided, however, where an appeal or other proceeding for review is taken, costs of the action, other than costs in connection with such appeal or other proceeding for review, shall abide the final determination of the cause. *Costs against the state of Utah, its officers and agencies shall be imposed only to the extent permitted by law.*

17. Section 78–27–44 states:

(1) In all actions brought to recover damages for personal injuries sustained by any person, resulting from or occasioned by the tort of any other person, corporation, association, or partnership, whether by negligence or willful intent of that other person, corporation, association, or partnership, and whether that injury shall have resulted fatally or otherwise, the plaintiff in the complaint may claim interest on the special damages actually incurred from the date of the occurrence of the act giving rise to the cause of action.

(2) It is the duty of the court, in entering judgment for plaintiff in that action, to add to the amount of special damages actually incurred that are assessed by the verdict of the jury, or found by the court, interest on that amount calculated at the legal rate, as defined in Section 15–1–1, from the date of the occurrence of the act giving rise to the cause of action to the date of entering the judgment, and to include it in that judgment.

(3) As used in this section, "special damages actually incurred" does not include damages for future medical expenses, loss of future wages, or loss of future earning capacity.
Utah Code Ann. § 78–27–44 (1996).

(2) *How assessed.* The party who claims his costs *must within five days after the entry of judgment* serve upon the adverse party against whom costs are claimed, a copy of a memorandum of the items of his costs and necessary disbursements in the action, and *file with the court a like memorandum thereof duly verified* stating that to affiant's knowledge the items are correct, and that the disbursements have been necessarily incurred in the action or proceeding.

Utah R. Civ. P. 54(d) (emphasis added). The trial court denied plaintiffs' requests for costs on two different grounds. First, regarding the Lyons' request, the court denied costs because the Lyons did not satisfy the portion of Rule 54(d)(2) emphasized above, requiring the filing of a verified memorandum of costs within five days after the entry of judgment. Second, regarding the Walkers' request, the court denied costs because of the absence of statutory authority permitting the award of costs as required by the sentence in Rule 54(d)(1) emphasized above, conditioning the awarding of "[c]osts against the state of Utah, its officers and agencies." *Id.* The trial court's reasoning regarding the Lyons' request is correct, but the trial court erred when it denied the Walkers' request by applying the last sentence of Rule 54(d)(1) to the District.

¶ 76 We begin by stating the appropriate standard of review. Generally, "[t]he determination to award taxable costs is within the sound discretion of the trial court and will not be disturbed absent an abuse of the discretion." *Ong Int'l (U.S.A.), Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 460 (Utah 1993) (citations omitted). In this case, however, the reasons for the trial court's decisions to deny plaintiffs' requests for costs are legal determinations. As to the court's rationale for denying the Lyons' request, Rule 54(d)(2) commands that "[t]he party who claims his costs *must* within five days after the entry of judgment" file with the court a duly verified memorandum of costs. Utah R. Civ. P. 54(d)(2) (emphasis added). This man-

datory language leaves no discretion to the court; therefore, we review this decision for correctness without deference to the trial court's conclusion.[18] The Walkers' request was denied on the basis of the trial court's conclusion that the District was an agency of the state and that no statute or court ruling permitted costs to be imposed against the District. We review this conclusion for correctness without deference.

¶ 77 The requirement in Rule 54(d)(2) that "the party who claims his costs must within five days after the entry of judgment" file with the court a verified memorandum of costs controls our disposition of the Lyons' request for costs. The trial court issued its judgment on July 11, 1995, and the Lyons did not file a verified memorandum of costs with the trial court until July 26. This is well beyond the five-day deadline of Rule 54(d)(2). As we stated in *Walker Bank & Trust Co. v. New York Terminal Warehouse Co.*, failure to satisfy the requirement for filing a verified memorandum of costs is fatal to a claim to recover costs under Rule 54. *See Walker Bank*, 10 Utah 2d 210, 216, 350 P.2d 626, 630–31 (1960). Here, as in *Walker Bank*, the Lyons' failure to file the verified memorandum of costs within five days of the judgment prevents the award of costs.

¶ 78 The Lyons argue, however, that they preserved the issue of costs for appeal by objecting on July 6 to the lack of any provision for costs in the proposed judgment and the order of motions drafted by defendants for the trial court's use. This argument is without merit. Though the Lyons' objection does preserve the issue of costs for appeal, as we stated above, to be eligible to receive costs the Lyons had to satisfy the requirements of Rule 54(d)(2). They failed to do so; therefore, the trial court did not err by denying the Lyons' request for costs.

¶ 79 Whether the Walkers are entitled to recover their costs turns on the requirement of Rule 54(d)(1) that "[c]osts

---

**18.** By concluding that the trial court's decision regarding the five-day filing requirement is a legal determination, which we review for correctness, this author expressly disavows the con-

clusion in *Watson v. Watson*, 837 P.2d 1, 7 (Utah Ct.App.1992), that this decision is reviewed under an abuse of discretion standard.

against the state of Utah, its officers and agencies shall be imposed only to the extent permitted by law." To recover costs against "the state of Utah, its officers and agencies," the prevailing party must point to a statute or rule of court that expressly or by clear implication waives the common law rule that costs are not recoverable. For this restriction on awarding costs to be applicable here, the District must be an agency of the state.

¶ 80 Our review of enactments by the Legislature indicates that the District is not a state agency. Several statutes in the Utah Code juxtapose the state of Utah and its agencies with fire protection districts like the District. For example, in defining "public body," section 11–31–2(3) states:

> "Public body" means *the state and* any public department, public agency, or other public entity existing under the laws of the state, including, without limitation, *any agency, authority, instrumentality, or institution of the state, and any* county, city, town, municipal corporation, quasi-municipal corporation, state university or college, school district, special service district or other special district, improvement district, water conservancy district, metropolitan water district, drainage district, irrigation district, *fire protection district,* separate legal or administrative entity created under the Interlocal Cooperation Act or other joint agreement entity, redevelopment agency, and any other political subdivision, public authority, public agency, or public trust existing under the laws of the state.

Utah Code Ann. § 11–32–2(7) (1999) (emphasis added); *see also id.* § 11–7–1(2)(d) ("Every incorporated municipality and every county may ... contract to receive fire protection from any ... fire district, state agency, or federal governmental agency ...."); *id.* § 11–34–1(2) (same as section 11–32–2(7)). This section defines "public body" as "any agency ... of the state, and any ... fire protection district," not as any agency of the state *including* any fire protection district. Thus, under the plain language of the statute, fire protection districts are categorized with other nonstate agency entities like counties, towns, and metropolitan water districts. If the District were an agency of the state,

the separate reference to fire protection districts would be meaningless. Because the District is not an agency of the state, the trial court erred by denying the Walkers' request for costs on the basis of the requirement in Rule 54(d)(1) that "[c]osts against the state of Utah, its officers and agencies shall be imposed only to the extent permitted by law." The trial court's denial of the Walkers' request for costs is therefore reversed and remanded for a determination of what costs the Walkers should recover.

¶ 81 Associate Chief Justice DURHAM concurs in Justice STEWART's opinion.

HOWE, Chief Justice: concurring in the result.

¶ 82 I concur in the remand for the purposes stated in the summary. I join in holding that section 63–30–34 is constitutional. In *Payne v. Myers,* 743 P.2d 186 (Utah 1987), we held that the 1978 amendment to section 63–30–4, which abrogated the right of an injured person to sue a state employee for negligence, did not violate article I, section 11 because the injured person was given the right to sue the state for the employee's negligence. Now, the plaintiffs in the instant case contend that that substitution is not an effective and reasonable alternative because the state's liability is capped as provided in section 63–30–34 at $250,000 for any one plaintiff. Plaintiffs argue this despite *McCorvey v. State Department of Transportation,* 868 P.2d 41 (Utah 1993), where we held that the damage cap did not violate article I, section 11, nor the due process clause or the uniform operation of laws clause in the Utah Constitution.

¶ 83 The Supreme Court of Oregon, in construing that state's open courts provision, which is almost identical to Utah's, held in *Mattson v. Astoria,* 39 Or. 577, 65 P. 1066 (1901), that the legislature may modify the remedy and former procedure and attach conditions precedent to the exercise of the right without violating the open courts provision. Thus the legislature should be accorded broad discretion in providing an alternative remedy. I believe that a $250,000 judgment against the state is an effective and reasonable substitution for a possibly greater judgment against a state employee.

I say this because experience has shown that large judgments against state employees for their negligence are often uncollectible. Typically, the employees have no insurance coverage for such a risk, have few personal unexempt assets, and are forced to seek a discharge of the judgment against them in bankruptcy. While the state currently indemnifies state employees, the legislature could repeal the statute providing for indemnification if large judgments against employees become burdensome to the state. A plaintiff who recovers a judgment against the state under our immunity act faces none of those problems of collectibility. In my opinion, the substitution of remedies is effective and reasonable.

¶ 84   Justice RUSSON concurs in Chief Justice HOWE's concurring in the result opinion.

ZIMMERMAN, Justice, concurring in the result with Chief Justice HOWE and Justice RUSSON:

¶ 85   The other members of the court are equally divided on the merits of the central issue in this case. I am casting the deciding vote. I join Chief Justice Howe and Justice Russon in upholding the damage caps contained in section 63–30–34 of the Code. However, I do not join in their article I, section 11 rationale which purports to follow the two-step analysis of *Berry v. Beech Aircraft,* 717 P.2d 670 (Utah 1985). Before I explain my views on the merits of the constitutional challenge mounted under article I, section 11 of the Utah Constitution and *Berry,* I will recap the positions of the members of the court as a preface.

¶ 86   On the one side, Associate Chief Justice Durham has joined in an opinion authored by Justice Stewart that would employ the two-step analysis of *Berry* to strike down the $250,000 damage cap established by section 63–30–34 of the Code. Under the first prong of the *Berry* test, they would find that the cap does not provide a "reasonable alternative remedy" for the common law negligence special and general damage award that the plaintiffs would have been entitled to receive from a state employee absent the cap. For them, any reduction in the dollar amount available at common law appears unacceptable under *Berry*'s first prong. Proceeding to the second prong, they would hold that there is no "clear social or economic evil to be eliminated" and that the abrogation of the common law damage remedy is an "arbitrary or unreasonable means for achieving" the legislature's declared objective. *See Berry,* 717 P.2d at 680; Stewart op. at ¶¶ 55–67.

¶ 87   On the other side, Justice Russon has joined in an opinion authored by Chief Justice Howe that would uphold the damage cap as satisfying the first prong of *Berry.* They reason that although the governmental liability is capped at $250,000, the plaintiffs receive something that they would not have had under the preexisting common law—a certain ability to collect any award up to the cap. Thus, by substituting a governmental entity for a governmental employee as the financially responsible party, the legislature has provided the plaintiffs with a "reasonable alternative remedy," albeit a potentially far smaller award of damages.

¶ 88   I do not join in either opinion on the article I, section 11 point. I would uphold the caps because I would overrule *Berry* and reject its two-step analytical model. I acknowledge that as one calling for the overruling of a precedent of this court, I carry a heavy burden under the doctrine of stare decisis. *See State v. Menzies,* 889 P.2d 393, 398–99 (Utah 1994). However, I believe I have met that burden, as explained in my separate opinion in *Craftsman Builder's Supply, Inc. v. Butler Manufacturing, Co.,* 1999 UT 18, ¶¶ 108–155, 974 P.2d 1194 (Zimmerman, J., concurring in the result).

¶ 89   I will only summarize the main points from that lengthy opinion here: I concluded that *Berry* has proven unworkable and should be abandoned. The two step test it advances is without solid definition. In an effort to make sense of it, we have repeatedly shifted course over the fifteen years since *Berry* was decided. This had led us to effectively constitutionalize the common law, and, most recently, even legislative enactments, to put them beyond the reach of attempts by the legislature to reduce exposure to tort liability. *See id.* at ¶ 123, 974 P.2d 1194;

*Day v. State ex rel. Dep't of Public Safety,* 1999 UT 46, ¶ 54, 980 P.2d 1171 (Zimmerman, J., dissenting). As a result, *Berry* has distorted our constitutional relationship to the legislature and placed us in the position of having to review legislative policy judgments on a de novo basis and with a skepticism we employ nowhere else. *See Craftsman,* 1999 UT 18, ¶ 138, 974 P.2d 1194. These failures lead me to call for an abandonment of *Berry's* interpretation of article I, section 11.

¶ 90 In my *Craftsman* opinion, I offered my alternative interpretation of the language of article I, section 11, as I felt duty bound to do, and to which I adhere today. I concluded that article I, section 11 should be read as a procedural guarantee and that we should largely retreat from second-guessing the legislature on the substantive matters that we have brought within our reach through the use of *Berry.* I suggested that there were other provisions within the Utah Constitution that might act to constrain the legislature when it acts to severely limit rights to recover for damages, but I did not attempt to elaborate on how those might operate. *See id.* at ¶ 152, 974 P.2d 1194. As a final note, I observed that a majority of the court seemed to have been drifting away from the *Berry* test and the results that it mandates. *See id.* at 1224 n. 2. In fact, I found the result reached in *Craftsman* itself to be inconsistent with *Berry. See id.*[1]

¶ 91 No member of this court joined any portion of my opinion in *Craftsman.* Yet again today, the result reached departs from what *Berry* requires. Chief Justice Howe's opinion, although seeming to apply the *Berry* test, is inconsistent with any meaningful application of *Berry,* as, for example, a simple comparison of his reasoning with that set forth in *Berry* or *Sun Valley Water Beds, Inc. v. Herm Hughes & Son, Inc.,* 782 P.2d 188 (Utah 1989), or in *Horton v. Goldminer's Daughter,* 785 P.2d 1087 (Utah 1989), or in Justice Stewart's opinion today, will demonstrate. Today's decision, taken together with the result in *Craftsman,* plainly demonstrates that a majority of the court is no longer willing to use *Berry* as a standard by which to judge legislative limitations on civil damage remedies. Yet because of the apparent unwillingness of a majority to openly depart from *Berry,* no consensus has begun to emerge as to what, if anything, should take its place. In my *Craftsman* opinion, I suggested a purely procedural reading of article I, section 11 is appropriate and a retreat from intrusive oversight of the legislature, backstopped by possible reliance on other provisions of the constitution to check egregious abuses of legislative power. *See Craftsman,* 1999 UT 18 at ¶¶ 152–153, 974 P.2d 1194. But that approach seems to lack support among my colleagues, and they have proposed no other alternative. That being

---

1. In his two-judge opinion, Justice Stewart spends considerable time attacking my failure to adhere to *Berry.* This appears to be a continuation of the diatribe he launched in response to my separate opinion in *Craftsman. See Craftsman,* 1999 UT 18 at ¶ 108, 974 P.2d 1194 (Zimmerman, J., concurring), 1203 (Stewart, J., concurring). Given the fulsomeness of our opinions in *Craftsman,* I am not sure what his effort today is intended to accomplish, other than to vent his frustration with the obvious erosion of *Berry. See id.* at ¶ 108, 974 P.2d 1194. I make only two points in response.

First, Justice Stewart attempts to portray me as a one-time strong supporter of his *Berry* analytical model by selectively quoting certain portions of my opinion in *Condemarin.* But the truth is that my *Condemarin* opinion did not rely on his two-step *Berry* analytical model. *See Condemarin v. University Hosp.,* 775 P.2d 348, 366–69 (Utah 1989) (Zimmerman, J., concurring). I proposed a substantive due process approach, a position that Justice Durham also took and which Justice Stewart vigorously criticized in his own *Condemarin* opinion. *See id.,* 775 P.2d at 369 (Stewart J., writing separately). I find it passingly strange that today Justice Stewart finds comfort for his *Berry* analytical model in my *Condemarin* opinion. But I suppose that for one piloting a sinking *Berry* ship, any port will do in a storm.

Second, I agree with Justice Stewart that the opinions in *Condemarin* are instructive, but I draw a different lesson from them than does he. Considered as a whole, I think those opinions show that as long as ten years ago, some members of this court were not fully comfortable with the rather rigid *Berry* analytical model Justice Stewart has championed and continued to write into the law with such persistence over the past fifteen years and were searching for other more useable models.

This debate between Justice Stewart and me is at an end. I trust that in the future, new solutions will be found to the real and knotty problem with which we have struggled for so long and with such vigor.

the case, it is time for us to at least go so far as to publicly acknowledge that one fifteen-year odyssey to find a way to prevent the legislature from riding roughshod over the rights of those civilly wronged, an odyssey that began with our response in *Berry* to the legislature's sweeping attempt at limiting tort actions against manufacturers in the Utah Product Liability Act, has gone awry. *Berry* cannot carry the freight we attempted to place on it, and we have not even looked seriously at another vehicle. It may be that a majority of the court will want to continue along the path it started in *Berry*, but in a different vehicle and with a less ambitious objective. Or it may decide to abandon the venture altogether. But in either event, attention needs to be turned to developing a different analytical model for addressing these issues.

¶ 92 I call upon the bar and the members of this court to drop the fixation on *Berry* and to creatively address the problem of how, in a post-*Berry* world, this court can remain within its appropriate sphere, while giving meaning to the constitutional provisions that speak of the importance of remedies for civil wrongs. What understandable standards can be fashioned that are practically capable of predictable application? There are plenty of ideas in various opinions written by members of this court over the years addressing, *inter alia*, article I, section 7 (due process clause); article I, section 24 (uniform operation of laws); article I, section 22 (takings clause); and article XVI, section 5 (wrongful death actions), that could be useful. The various opinions in *Condemarin*, for example, contain a number of veins of thought that could be profitably mined. But wherever the ideas are found, the fact remains that this court needs creative and capable advocates to advance new approaches and to help the court find its way.

2000 UT 55

On Petition for Rehearing

DURHAM, Justice.

¶ 1 Both plaintiffs and defendants have asked this court to reconsider various portions of its opinion in this case, issued on January 19, 2000. A majority of the court is unwilling to rehear any of the issues raised by plaintiffs' petition. However, defendants have identified an inconsistency between the "Summary" portion of our earlier opinion and the actual holding of the majority regarding the constitutionality of section 63–30–10(15) of the Utah Code and its implications for the trial court's decision on prejudgment interest.

¶ 2 The court's Summary noted, in subsection (iii) of paragraph one, that all members of the court agreed with Justice Stewart's holding "that the trial court erred in denying plaintiffs prejudgment interest." *Lyon v. Burton*, 2000 UT 19, ¶ 1, 387 Utah Adv. Rep. 27 [hereinafter "Lyon I"]. That portion of Justice Stewart's opinion, however, was predicated on his view that the damages cap was unconstitutional and that the trial court therefore erred in holding that prejudgment interest was subject to the cap. Because a majority of the court declared the cap constitutional, it becomes necessary to consider whether prejudgment interest is properly classified as "damages" under section 63–30–34 and therefore subject to the $250,000 cap.

¶ 3 Although I shared Justice Stewart's views on the constitutional question, I agree with defendants that, given the majority holding, prejudgment interest must, in fact, be considered part of the "judgment" the statute intended to limit. I therefore write for a reconstituted majority of the court [1] on the limited question of how to treat prejudgment interest in light of the statutory cap. We hold that section 78–27–44 clearly requires prejudgment interest to be "include[d] ... in th[e] judgment," Utah Code Ann. § 78–27–44(2) (1996), and that section 63–30–34 therefore subjects it to the $250,000 limit. We agree with and adopt the reasoning of the court of appeals in *Hart v. Salt Lake County Commission*, 945 P.2d 125, 139–40 (Utah Ct.App.1997) on the subject.

---

1. Justice Stewart retired and Justice Zimmerman resigned from the court shortly after the opinion in the case was handed down, leaving only myself, Chief Justice Howe, and Associate Chief Justice Russon with authority to consider the petition for rehearing.

¶ 4   We therefore vacate subsection (iii) of paragraph one in *Lyon I*, and affirm the ruling of the trial court denying plaintiffs prejudgment interest.

¶ 5   Justices DURRANT and WILKINS do not participate herein.[2]

¶ 6   Chief Justice HOWE and Associate Chief Justice RUSSON concur in Justice DURHAM's opinion.

---

2.   Because we decided not to rehear the case, but only to modify part of the court's earlier opinion, no further action is required.